# UNITED STATES DISTRICT COURT

for the

District of Columbia

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )     Case No.  25-SW-224
ONE RESIDENCE AND ONE PERSON )
UNDER RULE 41 )
)

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachments A-1 and A-2 (incorporated by reference)

Located within the jurisdiction of the District of Columbia, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B (incorporated by reference)

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
| --- | --- |
| 18 U.S.C. § 2252(a)(2) (Distribution/Receipt of Child Pornography) . | |

The application is based on these facts:
See Affidavit in Support of Application for Search Warrant.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Blake Frohnapfel, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
Telephone _____ *(specify reliable electronic means).*

Date:     8/11/2025

_____
*Judge's signature*

City and state:     Washington, D.C.

Moxila A. Upadhyaya
(United States Magistrate Judge)

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means          ☑ Original          ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | )    Case No.  25-SW-224 |
| ONE RESIDENCE AND ONE PERSON | ) |
| UNDER RULE 41 | ) |
| | ) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located within the jurisdiction of the District of Columbia. *(identify the person or describe the property to be searched and give its location)*:

See Attachments  A-1 and A-2 (incorporated by reference).

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment  B (incorporated by reference).

**YOU ARE COMMANDED** to execute this warrant on or before _____ August 25, 2025 _____ *(not to exceed 14 days)*

☑ in the daytime 6:00 a.m. to 10:00 p.m.     ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____ Moxila A. Upadhyaya _____ .

*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for _____ days *(not to exceed 30)*     ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued: _____ 8/11/2025 _____

*Judge's signature*

City and state: _____ Washington, D.C. _____     Moxila A. Upadhyaya

United States Magistrate Judge

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br><br>25-SW-224 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

| **Certification** |
|---|
|      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.<br><br><br>Date: _____          _____<br>                                         *Executing officer's signature*<br><br>                          _____<br>                                             *Printed name and title* |

## ATTACHMENT A-1

*Property to be searched*

The property to be searched is ▮▮▮▮▮▮▮▮▮▮▮, Washington, District of Columbia ▮▮▮, including other structures on the curtilage.  The property is a single-family multi-level residence with a brick façade and white double doors.  The address of ▮▮▮ ▮▮▮▮▮▮ appears on a sign on the front yard of the PREMISES.  The property is pictured below:





## **ATTACHMENT A-2**

*Person to be searched*

The person to be searched is **Victor Renato BLYTHE**, date of birth ████████,

pictured below:



## ATTACHMENT B

*Property to be seized*

1.      The items to be seized are fruits, evidence, information, contraband, or

instrumentalities, in whatever form and however stored, relating to violations of 18 U.S.C.

2252(a)(2), Distribution and Receipt of Child Pornography (the "TARGET OFFENSE"), that

have been committed by **Victor Renato BLYTHE** ("the SUBJECT") as described in the search

warrant affidavit, including, but not limited to:

a.   Evidence of the TARGET OFFENSE, including but not limited to: child pornography, child erotica, and any communications relating to the sexual exploitation of children;

b.   Evidence of any conspiracy, planning, or preparation to commit those offenses;

c.   Evidence concerning efforts after the fact to conceal evidence of those offenses, or to flee prosecution for the same;

d.   Evidence concerning materials, devices, or tools that were used to unlawfully commit the TARGET OFFENSE;

e.   Evidence of communication devices;

f.   Evidence of the state of mind of the subject and/or other co-conspirators, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, or knowledge and experience, related to the criminal activity under investigation; and

g.   Evidence concerning the identity of persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated with the unlawful actors about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts.

h.   Records or information relating to efforts to delete or destroy child pornography images or evidence relating to the sexual exploitation of children or to conceal evidence from law enforcement;

2.      Records and information that constitute evidence of identity, including but not limited to: documents, identification cards, and any physical items containing information relating to the identity of any individuals associated with the premises.

3.      Address and/or telephone books and papers reflecting names, addresses and/or telephone numbers, which constitute evidence of customers, distributors, conspirators, and potential witnesses of violations of the TARGET OFFENSE.

4.      Records and information—including but not limited to documents, communications, emails, online postings, photographs, videos, calendars, itineraries, receipts, and financial statements—relating to the sexual exploitation of children.

5.      Photographs, in particular photographs of co-conspirators, assets, and contraband, which constitute evidence of the TARGET OFFENSE.

6.      Evidence of relationships between members of a conspiracy, including evidence of identification and evidence of motivation to engage in TARGET OFFENSE.

7.      Cellular telephones, SIM cards, computers, laptops, I-Pads, DVDs, hard drives, and electronic store devices, and receipts reflecting their ownership and use, which contain records of the commission of the TARGET OFFENSE.

8.      Safes, both combination and key type, and their contents, which can contain evidence of the commission of the TARGET OFFENSE or proceeds from the commission of the TARGET OFFENSE.

9.      Indicia of ownership, including, receipts, invoices, bills, canceled envelopes, and keys, which provides evidence of identity as to individuals committing the TARGET OFFENSE; and

10.     Digital devices used in the commission of, or to facilitate, the above described offenses, including possessing, distributing, receiving, or transporting child pornography.

11.     For any digital device which is capable of containing and reasonably could contain fruits, evidence, information, contraband, or instrumentalities as described in the search warrant affidavit and above, hereinafter the "Device(s)":

    a.   evidence of who used, owned, or controlled the Device(s) at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, chat, instant messaging logs, photographs, and correspondence;

    b.   evidence of software, or the lack thereof, that would allow others to control the Device(s), such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    c.   evidence of the attachment to the Device(s) of other storage devices or similar containers for electronic evidence;

    d.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Device(s);

    e.   evidence of the times the Device(s) was used;

    f.   passwords, encryption keys, and other access devices that may be necessary to access the Device(s);

    g.   documentation and manuals that may be necessary to access the Device(s) or to conduct a forensic examination of the Device(s);

    h.   records of or information about Internet Protocol addresses used by the Device(s);

    i.   records of or information about the Device(s)'s Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages,

search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

     j.     contextual information necessary to understand the evidence described in this attachment.

12.     Routers, modems, and network equipment used to connect computers to the Internet.

During the execution of the search of the PREMISES described in Attachment A-1 and SUBJECT described in A-2, law enforcement personnel are also specifically authorized to obtain from Victor Renato BLYTHE (but not any other individuals present at the PREMISES at the time of execution of the warrant) the compelled display of any physical biometric characteristics (such as fingerprint/thumbprint, facial characteristics, or iris display) necessary to unlock any Device(s) requiring such biometric access subject to seizure pursuant to this warrant for which law enforcement has reasonable suspicion that the aforementioned person(s)' physical biometric characteristics will unlock the Device(s).  Law enforcement are authorized to attempt to unlock any such Device(s)'s security features in order to search the contents as authorized by this warrant by compelling the display of such a physical biometric characteristic; that is, (1) by pressing or swiping the fingers or thumbs of the aforementioned person against the fingerprint scanner of any such Device(s) and/or (2) by holding in front of the face of the aforementioned person to activate the facial recognition or iris recognition feature of any such Device(s).

While attempting to unlock the device by use of the compelled display of biometric characteristics pursuant to this warrant, law enforcement is not authorized to demand that the aforementioned person state or otherwise provide the password or identify the specific biometric characteristics (including the unique finger(s) or other physical features), that may be used to unlock or access the Device(s).  Nor does the warrant authorize law enforcement to use the fact

that the warrant allows law enforcement to obtain the display of any biometric characteristics to compel the aforementioned person to state or otherwise provide that information. However, the voluntary disclosure of such information by the aforementioned person is permitted. Specifically, agents in executing the warrant ask any of the aforementioned person for the password to any Device(s), or to identify which biometric characteristic (including the unique finger or other physical features) unlocks any Device(s), the agents will not state or otherwise imply that the warrant requires the person to provide such information, and will make clear that providing any such information is voluntary and that the person is free to refuse the request. As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "digital devices" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop computers, laptop computers, notebooks, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, USB flash drives, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); security devices; and any other type of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF ONE RESIDENCE AND ONE PERSON UNDER RULE 41** | **SW No. 25-SW-224**<br><br>**UNDER SEAL** |

**AFFIDAVIT IN SUPPORT OF AN APPLICATION**
**FOR A SEARCH AND SEIZURE WARRANT**

I, Blake E. Frohnapfel, being duly sworn, depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search (1) the premises located at ████████████ ██████████████████ (hereinafter "PREMISES"), further described in Attachment A-1, and (2) the person of Victor Renato BLYTHE (hereinafter "the SUBJECT"), further described in Attachment A-2 for the things described in Attachment B.

2.      I am a special agent with the Federal Bureau of Investigation, and I have been so employed since 2021.  I am currently assigned to the Washington Field Office (WFO) Child Exploitation and Human Trafficking Task Force (CEHTTF) and investigate violations involving child pornography, the sexual exploitation of children and related offenses.  I have training and experience in the enforcement of the laws of the United States, including the preparation and presentation of search warrant affidavits and in conducting search warrants.  I have had both training and experience in the investigation of crimes involving electronic media and have worked with other FBI agents who have such experience, and who have provided me with additional information about such crimes.  As a federal agent, I am authorized to investigate violations of United States laws and to execute warrants issued under the authority of the United States.

3.     I have participated in investigations involving computer-related offenses and have executed search warrants, including those involving searches and seizures of computers, digital media, software, and electronically stored information.  As part of my duties as a Special Agent, I investigate criminal child exploitation and child pornography violations, including the illegal production, distribution, transmission, receipt, and possession of child pornography, in violation of 18 U.S.C. §§ 2251, 2252 and 2252A, and crimes related to sex trafficking and other commercial sex offenses, in violation of 18 U.S.C. §§ 1591 and 1952.  As such, I am an "investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Section 2516 of Title 18, United States Code.

4.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant.  It does not set forth all of my knowledge, or the knowledge of others, about this matter.

5.     Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of 18 U.S.C. 2252(a)(2), Distribution and Receipt of Child Pornography (the "TARGET OFFENSE") have been committed by the SUBJECT.  There is also probable cause to search the PREMISES and the SUBJECT, further described in Attachment A-1 and Attachment A-2, for the things described in Attachment B.

**PROBABLE CAUSE**

6.      C.D.[1] is the subject of a Fairfax County Police Department ("FCPD") investigation related to alleged sexual abuse of potentially four minor victims.  FCPD executed search warrants for C.D.'s residence and office, during which FCPD seized and searched C.D.'s cellular telephone. As a result of FCPD's investigation, C.D. has been charged with multiple counts of Aggravated Sexual Battery and Indecent Liberties by Custodian.

7.      The search of C.D.'s cellular telephone resulted in the identification of text messages between C.D. and telephone number ██████, who was identified in C.D.'s cellular telephone as "Victor Blythe," the SUBJECT.

*Text Messages*

8.      Between August 8, 2019, and July 20, 2025, the SUBJECT exchanged text messages with C.D., while the SUBJECT used telephone number ██████.  During these text exchanges, among other topics, the SUBJECT and C.D. frequently described their sexual preferences for minors and discussed the content of attachments and Mega links[2] that C.D. sent to the SUBJECT.  The attachments that C.D. and the SUBJECT exchanged were not visible in the extraction of C.D.'s cellular telephone.

9.      For example, within text messages dated August 8, 2019, C.D. described an interaction C.D. had with a 13-year-old male, as further described below:

C.D.: [*Sends unknown attachment*]
SUBJECT: What's this?
C.D.: This 13 year old and I chatted for 90 minutes in Starbucks
C.D.:  he says he's straight
C.D.:  but his dick is 5 inches long

---

[1]  I am aware of C.D.'s identity based on information provided to me by the Fairfax County Police Department.
[2]  Mega is a file hosting service located in New Zealand.  Persons who collect child pornography are known to store child pornography on Mega and to share with one another links to folders containing child pornography.

C.D.:  He hit puberty when he was 11

C.D.:  He masturbates 3 times a day

C.D.:  Yes. I was having these conversations with him in a public Starbucks

C.D.:  I said to him…"I wouldn't tell your parents about this conversation if I were you."

C.D.:  He said…oh, no, they would assume you're a child predator…you're not right?"

C.D.:  then we talked about [name of local spa]

C.D.:  Being naked there

C.D.:  He said he would love to go there

C.D.:  I told him they'd love him there and why…

C.D.:  Blah Blah – then I opened into whether he shaves his balls

C.D.:  Each line of questions I pushed into something sexual

C.D.:  He opened up more and more

C.D.:  He messaged me this morning and said he was uncomfortable with our conversation yesterday and doesn't want to talk to me again…haha – looks like he spoke to a friend or his parents…and they told him to cut it off immediately…

C.D.:  And then he blocked me on Snapchat

C.D.:  That's ok. That was a fantasy that I got to enjoy- and now it's done – I can get back to focusing on work

SUBJECT: Good point

SUBJECT: You got about as far as you could have gotten given the circumstances

C.D.:  I know where he lives though

C.D.:  Not that I'll do anything – but it seems he' smore comfy talking in person…so if I run into him again? I'll regrill him and see what happened…

SUBJECT: Do you know his address?

C.D.:  Yep

C.D.:  Found him on public record

C.D.:  He said he bikes to Starbucks daily

SUBJECT: Well, you should go to that Starbucks again and kind of wait for him.

C.D.:  Maybe after he comes back from camp

C.D.:  Regardless – it was a wonderful conversation

SUBJECT: It sounds like it was an amazing conversation and you should be very thankful that you had the opportunity to enjoy it.  *Most people who have desires like you and me would never have been able to do what you did.* [emphasis added]

10.     A few weeks later, within text messages dated August 22, 2019, C.D. sent an attachment to the SUBJECT to which the SUBJECT responded by inquiring about the previously discussed 13-year-old, as further described below:

C.D.: [*Sends unknown attachment*]

SUBJECT: Friend of yours?

C.D.: Nice pic huh?

SUBJECT: Yeah.

SUBJECT: Friend of yours?

C.D.: Wishful thinking

C.D.: Who took the photo I wonder?

SUBJECT: Their father took the photo.
SUBJECT: Did you ever hear from that 13 year old?
C.D.: Nope
SUBJECT: How does that make you feel?
C.D.: How does that make YOU feel?
SUBJECT: I'd love to video tape you fucking a 12 year old.
C.D.: Uh huh
SUBJECT: How does that make you feel?

11.     Two days later, within text messages dated August 24, 2019, C.D. sent the

SUBJECT a series of messages which included attachments. The SUBJECT and C.D. shared the

following text messages:

C.D.: [*Sends five messages containing unknown attachments*]
C.D.: Watching a movie
SUBJECT: At home?
C.D.: Nope
SUBJECT: What movie?
SUBJECT: Porn?

12.     The texts dated August 26, 2019, through August 27, 2019, continued between

SUBJECT and C.D.:

C.D.: [*Sends unknown attachment*]
SUBJECT: How old?
C.D.: What do you think?
SUBJECT: Hard to tell because the crotch is shaven
SUBJECT: I'm going to guess anywhere between 14 to 19.
C.D.: 14
SUBJECT: How do you know?
C.D.: Cause he told me
C.D.: *[Sends unknown attachment]*
SUBJECT: How does that make you FEEL?
SUBJECT: He looks like your son!
C.D.: Does he look 14?
SUBJECT: Yes
SUBJECT: What do you want to do with him?
C.D.: We'll see
SUBJECT: Are you talking to him?
C.D.: Yep
C.D.: We're doing a video chat tonight
SUBJECT: Did you meet him on Grindr?
C.D.: [*Sends unknown attachment*]
SUJBECT: Nice

SUBJECT: Does he wear girls clothing?
C.D.: Only in photos
C.D.: Not in person
SUBJECT: How do you know?
C.D.: He told me?
SUBJECT: Are you excited?
C.D.: I'm cautious
SUBJECT: You should be!

13.     On text messages dated September 10, 2019, C.D. sent additional attachments via

text message to the SUBJECT that read in part:

C.D.: [*Sends two consecutive text messages containing unknown attachments*]
*SUBJECT:* Who is that?
C.D.: Just a pic
C.D.: Hot huh
SUBJECT: Yeah.
C.D.: How old?
SUBJECT: Approximately 13 or 14.
C.D.: It's absolutely stunning

14.     Similarly to the text messages dated September 10, 2019, on text messages dated

September 13, 2024, C.D.'s sent additional attachments via text to the SUBJECT:

C.D.: [*Sends two consecutive text messages containing unknown attachments*]
*C.D.:* Some nice things to wake up to
SUBJECT: How did you get these?
C.D.: Gayboystube.com freely posted
SUBJECT: Nice!
C.D.: They're all posted on my wall under Jamesfox
C.D.: Look me up
SUBJECT: Ok

15.     On text messages dated October 2, 2019, the SUBJECT and C.D. exchanged the

following text messages:

C.D.: Want me to send you some naughty photos?
SUBJECT: Of course!
C.D.: They're young
C.D.: Are you in a secure location
SUBJECT: Very secure location. I'm in my car.
C.D.: [*Sends unknown attachment*]
SUBJECT: That was great!
SUBJECT: Thank you!

SUBJECT: Who sent you that?
C.D.: Call me
C.D.: Mega

16.     On text messages dated November 23, 2019, C.D. sent additional attachments to

the SUBJECT, that read as follows:

C.D.: [*Sends four consecutive messages containing unknown attachments*]
SUBJECT: Who is that?

17.     On text messages dated February 20, 2020, the SUBJECT inquired about items

sent via Mega, as described below:

SUBJECT:  Did you just send me something at Mega?
C.D.: Yep
SUBJECT: Cool!
SUBJECT: Please don't send me female or girls. I'm not interested in them. I'm ONLY
interested in boys. Thanks!
C.D.: Haha
C.D.: Ok

18.     The conversation continued between the SUBJECT and C.D on text messages

dated March 3, 2020, described below:

C.D.: Sent you lots of really really good ones
SUBJECT: Ok. Thanks.
C.D.: Enjoy watching those?
SUBJECT: I haven't had a chance to see them yet, but I'm sure they are good.
C.D.: I've wanked 8 times tonight
SUBJECT: Oh my god!
C.D.: About to watch a few more before shutting off the lights
SUBJECT: The videos were AMAZING!!! What were your favorites?
C.D.: You watched them all?
SUBJECT: Just about!
SUBJECT: And jacked off to them, too!

19.     On text messages dated March 27, 2020, C.D. and the SUBJECT discussed

additional attachments C.D. shared to the SUBJECT via text message:

C.D.: [*Sends three unknown attachments*]
C.D.: I've cum 6 times this morning
C.D.: Another 6 just last night
SUBJECT: Amazing!

SUBJECT: Did you hook up with the boy?
C.D.: Nope
C.D.: His dad came home

20.    Within text messages dated May 8, 2020, the SUBJECT inquired whether C.D.

shared additional files via Mega:

SUBJECT: Did you send me a couple of files over the last few days on Mega?
C.D.: Yep
SUBJET: Good. Just checking. Always good to check to make sure they are no traps.
Lol.

21.    On a text message dated August 6, 2021, the SUBJECT sent C.D. a news article

titled, "Apple Will Report Child Sexual Abuse Images on iCloud to Law Enforcement" to C.D.,

with the accompanying text:

SUBJECT: You need to read this.
C.D.: I read that last night…
C.D.: I don't save images.
SUBJECT: What about the cloud?
C.D.: Nope.

22.    On text messages dated September 30, 2021, the following conversation occurred

between the SUBJECT and C.D. related to the SUBJECT's and C.D.'s interactions with minor

males at a local health club:[3]

SUBJECT: Have you had any boy stories lately?
C.D.:  Many
SUBJECT: Ahhhh….do tell!!
SUBJECT: Whirlpool is finally open in the Men's Locker Room in Bethesda. Saw a
teenage boy in there last week.
SUBJECT: Tell me about the boys.

23.    On text messages dated October 9, 2021, the conversation regarding interactions

with male minors at the local health club continued, as further described below:

C.D.: Lots of teens here
C.D.: Clearly the evening is the time to come here

---

[3]  The names of the businesses have been redacted in the text messages described herein, and the
businesses will be referred to generally based on the type of business.

C.D.: I'm only ever here mornings during the week
SUBJECT: Are teens in the locker room and sauna and showers?
C.D.: Nope
C.D.: Also: the gym just closed
C.D.: Wow…Sunday is clearly the day I should come here every week
SUBJECT: Why?
SUBJECT: I'm at the Redskins game now.
C.D.: There are teens and preteens everywhere
SUBJECT: Yum!!!
C.D.: All [*Playing*] Tennis
SUBJECT: I wish you could get pics!

24.    On text messages dated December 19, 2021, the SUBJECT and C.D.'s

conversation regarding interactions with male minors at the local health club continued:

SUBJECT: Where did you take the boy?
SUBJECT: [*Sends unknown attachment*] I did this boy from the hot tub at [*name of local health club*]
SUBJECT: [*Sends unknown attachment*]
SUBJECT: The 14 year old boy was back in the hot tub last night from the week before. I talked to him a little bit.  He said he was there by himself and took the bus home by himself.
*C.D.:*  You "did" him?
SUBJECT: I had sex with Sean. I took him home with me from [name of local health club]
SUBJECT: The 14 year old boy, I will work on next time.
C.D.: How old was Sean
SUBJECT: Sean is 28, but looks very young.
SUBJECT: He came twice.
C.D.: I came 12 times yesterday
C.D.: New material I found on Kik
SUBJECT:  Are you serious?? 12 times??
C.D.: Yes…My Willie was hurting when I tried once this morning lol
SUBJECT:  Can I see the new material you found on kik?
C.D.: Friend me on my new account on mega
*C.D.:* [*Sends Mega link*]
SUBJECT: Did you see my friend request?
C.D.: Sent it to you
SUBJECT: Got it.
C.D.: Enjoy
SUBJECT: Thanks

25.     On text messages dated March 7, 2022, the text conversation continued during

which the SUBJECT sent the following to C.D. related to the SUBJECT's interaction at the local

health club:

> SUBJECT: Just left [*name of local health club*]. There was a local 12 year old boy in the
> hot tub with his Father.  Just hit puberty about 4 months ago.  He had a few public hairs
> on his crotch. No hair anywhere else on his body. I think they were either Russian or
> Eastern European.

26.     On text messages dated March 30, 2022, the text conversations continued

between the SUBJECT and C.D. related to Mega:

> C.D.: Wow
> C.D.: This was a great set
> C.D.: One of the best
> SUBJECT: What are you talking about?
> C.D.: Look on mega
> SUBJECT: Oh, yeah! They are great!

27.     On text messages dated February 6, 2023, the following text conversation

occurred following C.D. sending a Mega link to the SUBJECT:

> C.D.: [*Sends Mega link*]
> SUBJECT: Wow! He's HOT!!
> SUBJECT: Where does he live?
> C.D.: Boston
> SUBJECT: Is that a video of you jacking off your cock while wearing rainbow socks?
> C.D.: Yep
> C.D.: So much cum

28.     Shortly after, on text messages dated February 11, 2023, the conversation

continued regarding additional videos C.D. sent to the SUBJECT:

> C.D.:  Sent you a new video too
> SUBJECT: Ok.
> SUBJECT: Great videos. Thanks for sending them.
> C.D.: Instagram is even better than the mega videos
> C.D.: Direct access to these kids
> SUBJECT: Yeah, these kids LOVE Instagram, lol.
> C.D.: No parents even monitoring
> SUBJECT: Is this kid in Mexico?
> C.D.: Yes

29.     On text messages dated March 15, 2023, C.D. and the SUBJECT again discussed

additional videos C.D. sent to the SUBJECT:

C.D.: Sent you some videos
C.D.: On mega
SUBJECT: I saw them. Thanks.
C.D.: Unfortunately – my Instagram account got shut down mid-way through our
conversation – we were finally in the trust stage – he was finally sending me videos
C.D.: And the person right before that I was chatting to kept asking me for my facepic
then second later he was no longer there – likely blocked me and reported me.

30.     On text messages dated July 2, 2023, the SUBJECT messaged C.D. regarding an

interaction at the previously mentioned local health club:

SUBJECT: So…..I was just sitting in the hot tub at [*name of local health club*] naked
with the high school football player, who was also naked, talking for 30 minutes. Lol.
SUBJECT: He ended up giving me his phone number.
C.D.: Why?
SUBJECT: Because I like him. And we had a good conversation. And he seemed to like
talking to me. And he is a virgin.
SUBJECT:  Why not?

31.     On text messages dated July 4, 2023, a brief text exchange occurred regarding a

mutual acquaintance, and then continued with the previous July 2, 2023 topic, as shown below:

SUBJECT: He told me that he is a virgin.
C.D.: How did that conversation come up though?
SUBJECT: What were you doing at a diner in Bethesda?
C.D.: I go every Tuesday morning after rescue squad
C.D.: I'm at regency right now. Quite a few cuties here.
SUBJECT: I asked him if he had a girlfriend, and he said, "no." Then he said that he has
never had a girlfriend.  Then, I asked him if he had ever had sex before, which he
sheepishly re[p]lied, "no" to.
SUBJECT: I will be at Regency at 2pm.
SUBJECT:  How long will you be there?
C.D.: Probably till 11
C.D.: Did you ask if he'd had a bf?
C.D.: Going to [*name of local spa*] at 5
C.D.: Wanna join?
SUBJECT: Will I get to see you naked?
C.D.: Yep
SUBJECT: Will I be able to play with your little wee-wee?

32.     On text messages dated September 9, 2024, and September 10, 2024, the

following text exchange occurred between the SUBJECT and C.D.:

> SUBJECT: victorXXXXXXX@gmail.com
> C.D.: I sent you something nice in Mega to have a look at
> SUBJECT: Ok. Thanks.

### *Identification of Subject*

33.     AT&T was identified as the service provider for the telephone number utilized to

communicate with C.D., ◼◼◼◼◼◼. In response to legal process, AT&T reported the

SUBJECT as the subscriber of the account associated with telephone number ◼◼◼◼◼◼.

The subscriber address associated with the AT&T account is the PREMISES.

34.     Legal process was issued to Google related to the email address the SUBJECT

provided to C.D. via text message on September 9, 2024, ◼◼◼◼◼◼◼◼◼◼◼. In

response, Google reported the SUBJECT as the subscriber of the ◼◼◼◼◼◼◼◼◼◼

email address and the address associated that Google email address is the PREMISES.

35.     The SUBJECT's District of Columbia driver's license listed the PREMISES as

the SUBJECT's address.

36.     On August 7, 2025, physical surveillance was conducted in the vicinity of the

PREMISES. A Lexus sedan bearing ◼◼◼◼◼◼◼◼◼◼ was observed in the

driveway of the PREMISES. ◼◼◼◼◼◼◼◼◼◼ is registered to the SUBJECT.

37.     According to open-source research, BLYTHE is a licensed clinical social worker

who specializes in the mental health field, specifically working with children and adolescents.

Blythe previously spent seven years in the Psychiatry department at Children's National Medical

Center in Washington, DC.

38.     Based on the foregoing information, I submit there is sufficient probable cause to

believe that the SUBJECT operated telephone number ◼◼◼◼◼◼. There is also probable

cause that a search of the PREMISES and SUBJECT will lead to evidence that the SUBJECT received and distributed child pornography and attempted to sexually exploit children. Specifically, because the SUBJECT used his cellular telephone to communicate with C.D. regarding the sexual exploitation of children, there is probable cause to believe that the SUBJECT's digital devices will contain evidence relating to child pornography and the sexual exploitation of children.

39.     It is well-known that virtually all adults in the United States use mobile digital devices.  In a fact sheet from June 12, 2019, The Pew Research Center for Internet & Technology estimated that 96% of Americans owned at least one cellular phone, and that the same 2019 report estimated that 81% of Americans use at least one smartphone.  *See* Mobile Fact Sheet, https://www.pewresearch.org/internet/fact-sheet/mobile/ (last visited Jan. 9, 2021).

40.     In addition, in my training and experience, it is common for individuals to back up or preserve copies of digital media (such as photos and videos) across multiple devices to prevent loss.  Indeed, some companies provide services that seamlessly sync data across devices, such as Apple devices and the Apple iCloud service.  Thus, there is reason to believe that evidence of the offense that originally resided on the SUBJECT's cell phone may also be saved to other digital devices within the PREMISES.

41.     Based on my training and experience, I also know that some individuals who participate in the TARGET OFFENSE have been known to use anonymizing services and/or applications capable of encrypting communications to protect their identity and communications. By using such tools, in some cases, the only way to see the content of these conversations is on the electronic device that had been used to send or receive the communications.

42.     The property to be searched includes laptop computers, mobile phones, tablets, and/or electronic devices owned, used, or controlled by the SUBJECT.

## CHARACTERISTICS OF INDIVIDUALS WITH A SEXUAL INTEREST IN CHILDREN AND/OR CHILD PORNOGRAPHY

43.     Information set forth elsewhere in this Affidavit—which indicates that a person at the PREMISES maintains and has distributed images of child sexual abuse—suggests that this person has a sexual interest in children or in sexually explicit images and videos of children.  My knowledge of these types of individuals and their characteristics is based on my training and experience as an FBI agent, as well as from other FBI agents who have such experience.  Based upon such training and experience, as well as upon information provided to me by other law enforcement officers, I am aware of the following general characteristics, which may be exhibited in varying combinations:

        a.      Individuals who have a sexual interest in children or images of children often receive sexual gratification, stimulation, and satisfaction from contact with children, from fantasies they often have viewing children engaged in sexual activity or in sexually suggestive poses (such as in person, in photographs, or other visual media), or from literature describing such activity.

        b.      Such individuals often collect sexually explicit or suggestive materials, in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media.  Such individuals oftentimes use these materials for their own sexual arousal and gratification.  They often also use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

        c.      This child pornographic material is usually maintained in the privacy and security of the individual's home or some other secure location.  Such individuals typically retain child pornographic material for many years.

d.      Likewise, such individuals often maintain their collections that are in a digital or electronic format in a safe, secure, and private environment, such as a computer and surrounding area.  These collections are often maintained for several years and are kept close by, usually at the individual's residence, to enable the individual to view the collection, which is valued highly.

e.      Due to the accessibility and availability of child pornography on the Internet, in my recent experience, instead of maintaining collections, some such individuals engage in a pattern of viewing or downloading child pornography online and then deleting the material.  This conduct also usually occurs at the individual's residence or some other secure location.

f.      Such individuals also often correspond with and/or meet others to share information and materials; rarely destroy correspondence from other child pornography distributors/collectors; conceal such correspondence as they do their sexually explicit material; and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography.

g.      Such individuals prefer not to be without access to child pornography for any prolonged time period.  This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world.

h.      Individuals whose sexual interest in children or images of children has led them to purchase access to paid websites or other commercial sources of child pornography frequently maintain the financial records of those transactions at their residences.

**TECHNICAL TERMS**

44.     Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

a.     "Digital device," as used herein, includes the following three terms and their respective definitions:

1)     A "computer" means an electronic, magnetic, optical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device. *See* 18 U.S.C. § 1030(e)(1).  Computers are physical units of equipment that perform information processing using a binary system to represent information.  Computers include, but are not limited to, desktop and laptop computers, smartphones, tablets, smartwatches, and binary data processing units used in the operation of other products like automobiles.

2)     "Digital storage media," as used herein, means any information storage device in which information is preserved in binary form and includes electrical, optical, and magnetic digital storage devices.  Examples of digital storage media include, but are not limited to, compact disks, digital versatile disks ("DVDs"), USB flash drives, flash memory cards, and internal and external hard drives.

3)     "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.  Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video

display monitors, modems, routers, scanners, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

        b.      "Wireless telephone" (or mobile telephone, or cellular telephone), a type of digital device, is a handheld wireless device used for voice and data communication at least in part through radio signals and also often through "wi-fi" networks. When communicating via radio signals, these telephones send signals through networks of transmitters/receivers, enabling communication with other wireless telephones, traditional "land line" telephones, computers, and other digital devices. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of applications and capabilities. These include, variously: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages, e-mail, and other forms of messaging; taking, sending, receiving, and storing still photographs and video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; utilizing global positioning system ("GPS") locating and tracking technology, and accessing and downloading information from the Internet.

        c.      A "tablet" is a mobile computer, typically larger than a wireless phone yet smaller than a notebook, that is primarily operated by touch-screen. Like wireless phones, tablets function as wireless communication devices and can be used to access the Internet or other wired or wireless devices through cellular networks, "wi-fi" networks, or otherwise. Tablets typically contain programs called applications ("apps"), which, like programs on both wireless phones, as described above, and personal computers, perform many different functions and save data associated with those functions.

d.    A "GPS" navigation device, including certain wireless phones and tablets, uses the Global Positioning System (generally abbreviated "GPS") to display its current location, and often retains records of its historical locations.  Some GPS navigation devices can give a user driving or walking directions to another location, and may contain records of the addresses or locations involved in such historical navigation. The GPS consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.    "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data.  Data security devices may consist of hardware, software, or other programming code.  A password (a string of alpha-numeric characters) usually operates as a digital key to "unlock" particular data security devices.  Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched.  Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

f.    "Computer software" means digital information which can be interpreted by a computer and any of its related components to direct the way they work.  Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

g.      Internet Protocol ("IP") Address is a unique numeric address used by digital devices on the Internet. An IP address, for present purposes, looks like a series of four numbers, each in the range 0-255, separated by periods (*e.g.*, 149.101.1.32).  Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

h.      The "Internet" is a global network of computers and other electronic devices that communicate with each other using numerous specified protocols.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

i.      "Internet Service Providers," or "ISPs," are entities that provide individuals and businesses access to the Internet.  ISPs provide a range of functions for their customers, including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment.  ISPs can offer a range of options in providing access to the Internet, including via telephone-based dial-up and broadband access via digital subscriber line ("DSL"), cable, dedicated circuits, fiber-optic, or satellite.  ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, which the connection supports.  Many ISPs assign each subscriber an account name, a user name or screen name, an e-mail address, an e-mail mailbox, and a personal password selected by the subscriber.  By using a modem, the subscriber can establish communication with an ISP and access the Internet by using his or her account name and password.

j.      A "modem" translates signals for physical transmission to and from the ISP, which then sends and receives the information to and from other computers connected to the

Internet.

        k.     A "router" often serves as a wireless Internet access point for a single or multiple devices, and directs traffic between computers connected to a network (whether by wire or wirelessly).  A router connected to the Internet collects traffic bound for the Internet from its client machines and sends out requests on their behalf.  The router also distributes to the relevant client inbound traffic arriving from the Internet.  A router usually retains logs for any devices using that router for Internet connectivity. Routers, in turn, are typically connected to a modem.

        l.     "Domain Name" means the common, easy-to-remember names associated with an IP address.  For example, a domain name of "www.usdoj.gov" refers to the IP address of 149.101.1.32.  Domain names are typically strings of alphanumeric characters, with each level delimited by a period. Each level, read backwards – from right to left – further identifies parts of an organization.  Examples of first-level, or top-level domains are typically .com for commercial organizations, .gov for the governmental organizations, .org for organizations, and .edu for educational organizations.  Second-level names will further identify the organization, for example usdoj.gov further identifies the United States governmental agency to be the Department of Justice. Additional levels may exist as needed until each machine is uniquely identifiable.  For example, www.usdoj.gov identifies the World Wide Web server located at the United States Department of Justice, which is part of the United States government.

        m.     "Cache" means the text, image, and graphic files sent to and temporarily stored by a user's computer from a website accessed by the user in order to allow the user speedier access to and interaction with that website in the future.

        n.     "Peer to Peer file sharing" (P2P) is a method of communication available to Internet users through the use of special software, which may be downloaded from the Internet. In general, P2P software allows a user to share files on a computer with other computer users

running compatible P2P software. A user may obtain files by opening the P2P software on the user's computer and searching for files that are currently being shared on the network. A P2P file transfer is assisted by reference to the IP addresses of computers on the network: an IP address identifies the location of each P2P computer and makes it possible for data to be transferred between computers. One aspect of P2P file sharing is that multiple files may be downloaded at the same time. Another aspect of P2P file sharing is that, when downloading a file, portions of that file may come from multiple other users on the network to facilitate faster downloading.

        1.     When a user wishes to share a file, the user adds the file to shared library files (either by downloading a file from another user or by copying any file into the shared directory), and the file's hash value is recorded by the P2P software. The hash value is independent of the file name; that is, any change in the name of the file will not change the hash value.

        ii.     Third party software is available to identify the IP address of a P2P computer that is sending a file. Such software monitors and logs Internet and local network traffic.

        o.     "VPN" means a virtual private network. A VPN extends a private network across public networks like the Internet. It enables a host computer to send and receive data across shared or public networks as if they were an integral part of a private network with all the functionality, security, and management policies of the private network. This is done by establishing a virtual point-to-point connection through the use of dedicated connections, encryption, or a combination of the two. The VPN connection across the Internet is technically a wide area network (WAN) link between the sites. From a user perspective, the extended network resources are accessed in the same way as resources available from a private network-hence the name "virtual private network." The communication between two VPN endpoints is encrypted

and usually cannot be intercepted by law enforcement.

p.      "Encryption" is the process of encoding messages or information in such a way that eavesdroppers or hackers cannot read it but authorized parties can.  In an encryption scheme, the message or information, referred to as plaintext, is encrypted using an encryption algorithm, turning it into an unreadable ciphertext.  This is usually done with the use of an encryption key, which specifies how the message is to be encoded.  Any unintended party that can see the ciphertext should not be able to determine anything about the original message.  An authorized party, however, is able to decode the ciphertext using a decryption algorithm that usually requires a secret decryption key, to which adversaries do not have access.

q.      "Malware," short for malicious (or malevolent) software, is software used or programmed by attackers to disrupt computer operations, gather sensitive information, or gain access to private computer systems.  It can appear in the form of code, scripts, active content, and other software.  Malware is a general term used to refer to a variety of forms of hostile or intrusive software.

## COMPUTERS, ELECTRONIC/MAGNETIC STORAGE, AND FORENSIC ANALYSIS

45.      As described above and in Attachment B, this application seeks permission to search for evidence, fruits, contraband, instrumentalities, and information that might be found on the PREMISES and/or on the SUBJECT, in whatever form they are found.  One form in which such items might be found is data stored on one or more digital devices.  Such devices are defined above and include any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop computers, laptop computers, notebooks, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended

for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, USB flash drives, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.  Thus, the warrant applied for would authorize the seizure of digital devices or, potentially, the copying of stored information, all under Rule 41(e)(2)(B).  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit that, if digital devices are found on the PREMISES and/or on the SUBJECT, there is probable cause to believe that the items described in Attachment B will be stored in the Device(s) for at least the following reasons:

      a.     Individuals who engage in criminal activity, including individuals who distribute child pornography, use digital devices to store and distribute child sexual abuse images.

      b.     Individuals who engage in the foregoing criminal activity, in the event that they change digital devices, will often "back up" or transfer files from their old digital devices to that of their new digital devices, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

      c.     Digital device files, or remnants of such files, can be recovered months or even many years after they have been downloaded onto the medium or device, deleted, or viewed via the Internet.  Electronic files downloaded to a digital device can be stored for years at little or no cost.  Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools.  When a person "deletes" a file on a digital device such as a home computer, a smart phone, or a memory card, the data contained in the file does not actually disappear; rather, that data remains on the storage medium and within the device unless and until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in

free space or slack space – that is, in space on the digital device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten. In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve "residue" of an electronic file from a digital device depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

46.    As further described in Attachment B, this application seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the crimes described in this affidavit, but also for forensic electronic evidence or information that establishes how the digital device(s) were used, the purpose of their use, who used them (or did not), and when. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be in any of the Device(s) at issue here because:

a.    Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the digital device(s) are, as described further in the attachments, called for

by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole. Digital data stored in the Device(s), not currently associated with any file, can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a digital device were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other digital device was in use. Computer, smart phone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

    b.    Forensic evidence on a digital device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, chats, instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the digital device at a relevant time, and potentially who did not.

c.      A person with appropriate familiarity with how a digital device works can, after examining this forensic evidence in its proper context, draw conclusions about how such digital devices were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, digital device evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device. For example, the presence or absence of counter-forensic programs, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

f.      I know that when an individual uses a digital device to distribute child pornography, the individual's device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The digital device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The digital device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a digital device used to commit a crime of this type may contain data that is evidence of how the digital device was used; data that was sent or received; notes as to how

the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense and the identities of those perpetrating it.

## METHODS TO BE USED TO SEARCH DIGITAL DEVICES

47.    Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

a.    Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time, in part because there are so many types of digital devices and software programs in use today. Digital devices – whether, for example, desktop computers, mobile devices, or portable storage devices – may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise. As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

b.    Digital data is particularly vulnerable to inadvertent or intentional modification or destruction.  Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  Recovery of "residue" of electronic files from digital devices also requires specialized tools and often substantial time.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is often essential to conducting a complete and accurate analysis of data stored on digital devices.

c.      Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.  Evidence of the absence of particular data or software on a digital device is not segregable from the digital device itself.  Analysis of the digital device as a whole to demonstrate the absence of particular data or software requires specialized tools and a controlled laboratory environment, and can require substantial time.

d.      Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions.  For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear as though the file contains text.  Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.   Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms. Moreover, certain file formats, like portable document format ("PDF"), do not lend themselves to keyword searches.  Some applications for computers, smart phones, and other digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-text format.  Documents printed by a computer, even if the document was never saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the

printed document is stored by the computer as a graphic image and not as text. In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography, a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband, or instrumentalities of a crime.

e.      Analyzing the contents of mobile devices, including tablets, can be very labor intensive and also requires special technical skills, equipment, and software. The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before examination of the device. Additionally, most smart phones and other mobile devices require passwords for access. For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode. Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer. Mobile devices used by individuals engaged in criminal activity are often further protected and encrypted by one or more third party applications, of which there are many. For example, one such mobile application, "Hide It Pro," disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

f.      Based on all of the foregoing, I respectfully submit that searching any digital device for the information, records, or evidence pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete.  Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the devices. In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

48.     The volume of data stored on many digital devices will typically be so large that it will be extremely impractical to search for data during the physical search of the premises.

a.      Therefore, in searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

(1)     Upon securing the PREMISES, law enforcement personnel will, consistent with Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, seize any digital devices (that is, the Device(s)), within the scope of this warrant as defined above, deemed capable of containing the information, records, or evidence described in Attachment B and transport these items to an appropriate law enforcement laboratory or similar facility for review.  For all the reasons described above, it would not be feasible to conduct a complete, safe, and appropriate search of any such digital devices at the PREMISES.  The digital devices, and/or any digital images thereof created by law enforcement sometimes with the aid of a technical expert, in an appropriate setting, in aid of the examination and review, will be examined and reviewed in order to extract and seize the information, records, or evidence described in Attachment B.

(2)     The analysis of the contents of the digital devices may entail any or all of various forensic techniques as circumstances warrant.  Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

(3)     In searching the digital devices, the forensic examiners may examine as much of the contents of the digital devices as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in Attachment B.  In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B.  Any search techniques or protocols used in searching the contents of the seized digital devices will be specifically chosen to identify the specific items to be seized under this warrant.

49.     This warrant permits law enforcement agents to obtain from the person of the SUBJECT (but not any other individuals present at the PREMISES at the time of execution of the warrant) the compelled display of any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock any Device(s) requiring such biometic access subject to seizure pursuant to this warrant for which law enforcement has

reasonable suspicion that the aforementioned person(s)' physical biometric characteristics will unlock the Device(s). The grounds for this request are as follows:

50. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features, and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

51. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

52. If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face. For example, this feature is available on certain Android devices and is called "Trusted Face." During the Trusted Face registration process, the user holds the device in front of his or her face. The device's front-facing camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers (such as Apple's "Face ID") have different names but operate similarly to Trusted Face.

53.     If a device is equipped with an iris-recognition feature, a user may enable the ability to unlock the device with his or her irises. For example, on certain Microsoft devices, this feature is called "Windows Hello." During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face. The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises. The device can then be unlocked if the infrared-sensitive camera detects the registered irises. Iris-recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

54.     In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

55.     . As discussed in this Affidavit, your Affiant has reason to believe that one or more digital devices, the Device(s), will be found during the search. The passcode or password that would unlock the Device(s) subject to search under this warrant currently is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the Device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

56.     I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of

time. For example, Apple devices cannot be unlocked using Touch ID when: (1) more than 48

hours has elapsed since the device was last unlocked; or, (2) when the device has not been unlocked

using a fingerprint for 8 hours and the passcode or password has not been entered in the last 6

days. Similarly, certain Android devices cannot be unlocked with Trusted Face if the device has

remained inactive for four hours. Biometric features from other brands carry similar restrictions.

Thus, in the event law enforcement personnel encounter a locked device equipped with biometric

features, the opportunity to unlock the device through a biometric feature may exist for only a

short time.

57.    Due to the foregoing, if law enforcement personnel encounter any Device(s) that

are subject to seizure pursuant to this warrant and may be unlocked using one of the

aforementioned biometric features, this warrant permits law enforcement personnel to obtain from

the aforementioned person(s) the display of any physical biometric characteristics (such as

fingerprint/thumbprint or facial characteristics) necessary to unlock any Device(s), including to

(1) press or swipe the fingers (including thumbs) of the aforementioned person(s) to the fingerprint

scanner of the Device(s) found at the PREMISES; (2) hold the Device(s) found at the PREMISES

in front of the face of the aforementioned person(s) to activate the facial recognition feature; and/or

(3) hold the Device(s) found at the PREMISES in front of the face of the  aforementioned person(s)

to activate the iris recognition feature, for the purpose of attempting to unlock the Device(s) in

order to search the contents as authorized by this warrant.

58.    The proposed warrant does not authorize law enforcement to require that the

aforementioned person(s) state or otherwise provide the password, or identify specific biometric

characteristics (including the unique finger(s) or other physical features) that may be used to

unlock or access the Device(s). Nor does the proposed warrant authorize law enforcement to use

the fact that the warrant allows law enforcement to obtain the display of any biometric

characteristics to compel the aforementioned person(s) to state or otherwise provide that information. However, the voluntary disclosure of such information by the aforementioned person(s) would be permitted under the proposed warrant. To avoid confusion on that point, if agents in executing the warrant ask any of the aforementioned person(s) for the password to any Device(s), or to identify which biometric characteristic (including the unique finger(s) or other physical features) unlocks any Device(s), the agents will not state or otherwise imply that the warrant requires the person to provide such information, and will make clear that providing any such information is voluntary and that the person is free to refuse the request.

## **CONCLUSION**

59.    Based on the above, I respectfully submit there is probable cause to search the PREMISES and SUBJECT described in Attachments A-1 and A-2 and to seize items described in Attachment B-1.

Respectfully submitted,

_____
Blake Frohnapfel
Special Agent
Federal Bureau of Investigation

Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on the 11th of August, 2025.

_____
MOXILA A. UPADHYAYA
UNITED STATES MAGISTRATE JUDGE