# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 25-cr-253 (DLF)** |
| **VICTOR RENATO BLYTHE,** | |
| **Defendant.** | |

## GOVERNMENT'S OPPOSITION TO THE
## DEFENDANT'S MOTION TO SUPPRESS TANGIBLE EVIDENCE

The United States of America, by and through its undersigned counsel, respectfully opposes the defendant's Motion to Suppress Tangible Evidence ("Motion"), dated September 24, 2025. The acquisition of Mr. Blythe's biometrics was in accordance with the procedures outlined in *United States v. Brown*, 125 F.4th 1186 (D.D.C. 2025), and permitted under the Fifth Amendment of the United States Constitution.

## BACKGROUND

### I.    Statement of Facts

C.D.[1] is the subject of a Fairfax County Police Department ("FCPD") investigation related to alleged sexual abuse of potentially four minor victims. FCPD executed search warrants for C.D.'s residence and office, during which FCPD seized and searched C.D.'s cellular telephone. The search of C.D.'s cellular telephone resulted in the identification of text messages between C.D. and telephone number 202-276-XXXX, who was identified in C.D.'s cellular telephone as "Victor Blythe."

For nearly six years, between August 8, 2019, and July 20, 2025, Mr. Blythe, using telephone

---

[1] Law enforcement learned of C.D.'s identity based on information provided by the Fairfax County Police Department.

number 202-276-XXXX, exchanged text messages with C.D.  During these text exchanges, among other topics, Mr. Blythe and C.D. frequently described their sexual preferences for minors and discussed the content of attachments and Mega links[2] that C.D. sent to Mr. Blythe.  The attachments that C.D. and the SUBJECT exchanged were not visible in the extraction of C.D.'s cellular telephone because C.D. had deleted the text exchange prior to law enforcement extracting the phone.

For example, within text messages dated August 8, 2019, C.D. described an interaction C.D. had with a 13-year-old male, as further described below:

C.D.: [*Sends unknown attachment*]
Mr. Blythe: What's this?
C.D.: This 13 year old and I chatted for 90 minutes in Starbucks
C.D.:  he says he's straight
C.D.:  but his dick is 5 inches long
C.D.:  He hit puberty when he was 11
C.D.:  He masturbates 3 times a day
C.D.:  Yes. I was having these conversations with him in a public Starbucks
C.D.:  I said to him…"I wouldn't tell your parents about this conversation if I were you."
C.D.:  He said…oh, no, they would assume you're a child predator…you're not right?"
C.D.: then we talked about [*name of local spa*]
C.D.: Being naked there
C.D.: He said he would love to go there
C.D.: I told him they'd love him there and why…
C.D.: Blah Blah – then I opened into whether he shaves his balls
C.D.: Each line of questions I pushed into something sexual
C.D.: He opened up more and more
C.D.: He messaged me this morning and said he was uncomfortable with our conversation yesterday and doesn't want to talk to me again…haha – looks like he spoke to a friend or his parents…and they told him to cut it off immediately…
C.D.: And then he blocked me on Snapchat
C.D.: That's ok. That was a fantasy that I got to enjoy- and now it's done – I can get back to focusing on work
Mr. Blythe: Good point
Mr. Blythe: You got about as far as you could have gotten given the circumstances
C.D.: I know where he lives though
C.D.: Not that I'll do anything – but it seems he' smore comfy talking in person…so if I run into him again? I'll regrill him and see what happened…
Mr. Blythe: Do you know his address?

---

[2] Mega is a file hosting service located in New Zealand.  Persons who collect child pornography are known to store child pornography on Mega and to share with one another links to folders containing child pornography.

C.D.: Yep
C.D.: Found him on public record
C.D.: He said he bikes to Starbucks daily
Mr. Blythe: Well, you should go to that Starbucks again and kind of wait for him.
C.D.: Maybe after he comes back from camp
C.D.: Regardless – it was a wonderful conversation
Mr. Blythe: It sounds like it was an amazing conversation and you should be very thankful that you had the opportunity to enjoy it. *Most people who have desires like you and me would never have been able to do what you did.* [emphasis added]

A few weeks later, within text messages dated August 22, 2019, C.D. sent an attachment to Mr. Blythe to which Mr. Blythe responded by inquiring about the previously discussed 13-year-old, as further described below:

C.D.: [*Sends unknown attachment*]
Mr. Blythe: Friend of yours?
C.D.: Nice pic huh?
Mr. Blythe: Yeah.
Mr. Blythe: Friend of yours?
C.D.: Wishful thinking
C.D.: Who took the photo I wonder?
Mr. Blythe: Their father took the photo.
Mr. Blythe: Did you ever hear from that 13 year old?
C.D.: Nope
Mr. Blythe: How does that make you feel?
C.D.:  How does that make YOU feel?
Mr. Blythe:  I'd love to video tape you fucking a 12 year old.
C.D.: Uh huh
Mr. Blythe: How does that make you feel?

Two days later, within text messages dated August 24, 2019, C.D. sent Mr. Blythe a series of messages which included attachments.  Mr. Blythe and C.D. shared the following text messages:

C.D.: [*Sends five messages containing unknown attachments*]
C.D.: Watching a movie
Mr. Blythe: At home?
C.D.: Nope
Mr. Blythe: What movie?
Mr. Blythe: Porn?

The texts dated August 26, 2019, through August 27, 2019, continued between Mr. Blythe and C.D.:

3

C.D.: [*Sends unknown attachment*]
Mr. Blythe: How old?
C.D.: What do you think?
Mr. Blythe: Hard to tell because the crotch is shaven
Mr. Blythe:  I'm going to guess anywhere between 14 to 19.
C.D.: 14
Mr. Blythe: How do you know?
C.D.: Cause he told me
C.D.: *[Sends unknown attachment]*
Mr. Blythe: How does that make you FEEL?
Mr. Blythe: He looks like your son!
C.D.: Does he look 14?
Mr. Blythe: Yes
Mr. Blythe: What do you want to do with him?
C.D.: We'll see
Mr. Blythe: Are you talking to him?
C.D.: Yep
C.D.: We're doing a video chat tonight
Mr. Blythe: Did you meet him on Grindr?
C.D.: [*Sends unknown attachment*]
Mr. Blythe: Nice
Mr. Blythe: Does he wear girls clothing?
C.D.: Only in photos
C.D.: Not in person
Mr. Blythe: How do you know?
C.D.: He told me?
Mr. Blythe: Are you excited?
C.D.: I'm cautious
Mr. Blythe: You should be!

On text messages dated September 10, 2019, C.D. sent additional attachments via text

message to Mr. Blythe that read in part:

C.D.: [*Sends two consecutive text messages containing unknown attachments*]
Mr. Blythe: Who is that?
C.D.: Just a pic
C.D.: Hot huh
Mr. Blythe: Yeah.
C.D.: How old?
Mr. Blythe: Approximately 13 or 14.
C.D.: It's absolutely stunning

Similarly to the text messages dated September 10, 2019, on text messages dated September

13, 2024, C.D.'s sent additional attachments via text to Mr. Blythe:

4

C.D.: [*Sends two consecutive text messages containing unknown attachments*]
C.D.: Some nice things to wake up to
Mr. Blythe: How did you get these?
C.D.: Gayboystube.com freely posted
Mr. Blythe: Nice!
C.D.: They're all posted on my wall under XXXX
C.D.: Look me up
Mr. Blythe: Ok

On text messages dated October 2, 2019, Mr. Blythe and C.D. exchanged the following text

messages:

C.D.: Want me to send you some naughty photos?
Mr. Blythe: Of course!
C.D.: They're young
C.D.: Are you in a secure location
Mr. Blythe: Very secure location. I'm in my car.
C.D.: [*Sends unknown attachment*]
Mr. Blythe: That was great!
Mr. Blythe: Thank you!
Mr. Blythe: Who sent you that?
C.D.: Call me
C.D.: Mega

On text messages dated November 8, 2019, C.D. and Mr. Blythe sent an attachment to C.D.

as the two discussed C.D.'s recent date with a woman:

Mr. Blythe: I'm 55, and it can be really difficult to maintain an erection with someone, even
a hot 12 year old on the cusp of puberty! [*winking emoji*]
Mr. Blythe: [*sends unknown attachment*]
C.D.: Old photo
C.D.: Which I sent to you
Mr. Blythe: I know! [*winking emoji*]
Mr. Blythe: Thought I'd give you a little inspiration.

On text messages dated November 9, 2019, Mr. Blythe and C.D. discussed C.D.'s stepson:[3]

Mr. Blythe: You need to focus on developing the sort of relationship with [stepson] that you
ultimately want with him. He is getting older and your window with him as a child
and a young teenager is a very small window.
C.D.: Behave
C.D.: Not happening with [stepson]

---

[3] Although C.D.'s charges include sexual abuse against his stepdaughters, Virginia authorities have not
charged any conduct related to his stepson.

Mr. Blythe: Stop reading into things.

On text messages dated November 23, 2019, C.D. sent additional attachments to Mr.

Blythe, that read as follows:

>C.D.: [*Sends four consecutive messages containing unknown attachments*]
>Mr. Blythe: Who is that?

On text messages dated February 20, 2020, Mr. Blythe inquired about items sent via Mega,

as described below:

>Mr. Blythe:  Did you just send me something at Mega?
>C.D.: Yep
>Mr. Blythe: Cool!
>Mr. Blythe: Please don't send me female or girls. I'm not interested in them. I'm ONLY interested in boys. Thanks!
>C.D.: Haha
>C.D.: Ok

The conversation continued between Mr. Blythe and C.D on text messages dated March 3,

2020, described below:

>C.D.: Sent you lots of really really good ones
>Mr. Blythe: Ok. Thanks.
>C.D.: Enjoy watching those?
>Mr. Blythe: I haven't had a chance to see them yet, but I'm sure they are good.
>C.D.: I've wanked 8 times tonight
>Mr. Blythe: Oh my god!
>C.D.: About to watch a few more before shutting off the lights
>Mr. Blythe: The videos were AMAZING!!! What were your favorites?
>C.D.: You watched them all?
>Mr. Blythe: Just about!
>Mr. Blythe: And jacked off to them, too!

On text messages dated March 27, 2020, C.D. and Mr. Blythe discussed additional

attachments C.D. shared to Mr. Blythe via text message:

>C.D.: [*Sends three unknown attachments*]
>C.D.: I've cum 6 times this morning
>C.D.: Another 6 just last night
>Mr. Blythe: Amazing!
>Mr. Blythe: Did you hook up with the boy?
>C.D.: Nope

C.D.: His dad came home

Within text messages dated May 8, 2020, Mr. Blythe inquired whether C.D. shared

additional files via Mega:

Mr. Blythe: Did you send me a couple of files over the last few days on Mega?
C.D.: Yep
Mr. Blythe: Good. Just checking. Always good to check to make sure they are no traps. Lol.

On a text message dated August 6, 2021, Mr. Blythe sent C.D. a news article titled, "Apple

Will Report Child Sexual Abuse Images on iCloud to Law Enforcement" to C.D., with the

accompanying text:

Mr. Blythe: You need to read this.
C.D.: I read that last night…
C.D.: I don't save images.
Mr. Blythe: What about the cloud?
C.D.: Nope.

On text messages dated September 30, 2021, the following conversation occurred between

Mr. Blythe and C.D. related to Mr. Blythe's and C.D.'s interactions with minor males at a local

health club:[4]

Mr. Blythe: Have you had any boy stories lately?
C.D.: Many
Mr. Blythe: Ahhhh….do tell!!
Mr. Blythe: Whirlpool is finally open in the Men's Locker Room in Bethesda. Saw a
teenage boy in there last week.
Mr. Blythe: Tell me about the boys.

On text messages dated October 9, 2021, the conversation regarding interactions with male

minors at the local health club continued, as further described below:

C.D.: Lots of teens here
C.D.: Clearly the evening is the time to come here
C.D.: I'm only ever here mornings during the week
Mr. Blythe: Are teens in the locker room and sauna and showers?
C.D.: Nope

_____
[4] The names of the businesses have been redacted in the text messages described herein, and the businesses
will be referred to generally based on the type of business.

7

C.D.: Also: the gym just closed
C.D.: Wow…Sunday is clearly the day I should come here every week
Mr. Blythe: Why?
Mr. Blythe: I'm at the Redskins game now.
C.D.: There are teens and preteens everywhere
Mr. Blythe: Yum!!!
C.D.: All [*Playing*] Tennis
Mr. Blythe: I wish you could get pics!

On text messages dated December 19, 2021, Mr. Blythe and C.D.'s conversation regarding

interactions with male minors at the local health club continued:

Mr. Blythe: Where did you take the boy?
Mr. Blythe: [*Sends unknown attachment*] I did this boy from the hot tub at [*name of local health club*]
Mr. Blythe: [*Sends unknown attachment*]
Mr. Blythe: The 14 year old boy was back in the hot tub last night from the week before. I talked to him a little bit.  He said he was there by himself and took the bus home by himself.
C.D.:  You "did" him?
Mr. Blythe: I had sex with XXXX. I took him home with me from [*name of local health club*]
Mr. Blythe: The 14 year old boy, I will work on next time.
C.D.: How old was XXXX
Mr. Blythe: XXXX is 28, but looks very young.
Mr. Blythe: He came twice.
C.D.: I came 12 times yesterday
C.D.: New material I found on Kik
Mr. Blythe:  Are you serious?? 12 times??
C.D.: Yes…My Willie was hurting when I tried once this morning lol
Mr. Blythe:  Can I see the new material you found on kik?
C.D.: Friend me on my new account on mega
C.D.: [*Sends Mega link*]
Mr. Blythe: Did you see my friend request?
C.D.: Sent it to you
Mr. Blythe: Got it.
C.D.: Enjoy
Mr. Blythe: Thanks

On text messages dated March 7, 2022, the text conversation continued during which Mr.

Blythe sent the following to C.D. related to Mr. Blythe's interaction at the local health club:

Mr. Blythe: Just left [*name of local health club*]. There was a local 12 year old boy in the hot tub with his Father.  Just hit puberty about 4 months ago.  He had a few public hairs on his crotch. No hair anywhere else on his body. I think they were either Russian or Eastern European.

On text messages dated March 30, 2022, the text conversations continued between Mr.

Blythe and C.D. related to Mega:

      C.D.: Wow
      C.D.: This was a great set
      C.D.: One of the best
      Mr. Blythe: What are you talking about?
      C.D.: Look on mega
      Mr. Blythe: Oh, yeah! They are great!

On text messages dated February 6, 2023, the following text conversation occurred

following C.D. sending a Mega link to Mr. Blythe:

      C.D.: [*Sends Mega link*]
      Mr. Blythe: Wow! He's HOT!!
      Mr. Blythe: Where does he live?
      C.D.: Boston
      Mr. Blythe: Is that a video of you jacking off your cock while wearing rainbow socks?
      C.D.: Yep
      C.D.: So much cum

Shortly after, on text messages dated February 11, 2023, the conversation continued

regarding additional videos C.D. sent to Mr. Blythe:

      C.D.:  Sent you a new video too
      Mr. Blythe: Ok.
      Mr. Blythe: Great videos. Thanks for sending them.
      C.D.: Instagram is even better than the mega videos
      C.D.: Direct access to these kids
      Mr. Blythe: Yeah, these kids LOVE Instagram, lol.
      C.D.: No parents even monitoring
      Mr. Blythe: Is this kid in Mexico?
      C.D.: Yes

On text messages dated March 15, 2023, C.D. and Mr. Blythe again discussed additional

videos C.D. sent to Mr. Blythe:

      C.D.: Sent you some videos
      C.D.: On mega
      Mr. Blythe: I saw them. Thanks.
      C.D.: Unfortunately – my Instagram account got shut down mid-way through our
      conversation – we were finally in the trust stage – he was finally sending me videos

C.D.: And the person right before that I was chatting to kept asking me for my facepic then second later he was no longer there – likely blocked me and reported me.

On text messages dated July 2, 2023, Mr. Blythe messaged C.D. regarding an interaction at

the previously mentioned local health club:

Mr. Blythe: So…..I was just sitting in the hot tub at [*name of local health club*] naked with the high school football player, who was also naked, talking for 30 minutes. Lol.
Mr. Blythe: He ended up giving me his phone number.
C.D.: Why?
Mr. Blythe: Because I like him. And we had a good conversation. And he seemed to like talking to me. And he is a virgin.
Mr. Blythe:  Why not?

On text messages dated July 4, 2023, a brief text exchange occurred regarding a mutual

acquaintance, and then continued with the previous July 2, 2023, topic, as shown below:

Mr. Blythe: He told me that he is a virgin.
C.D.: How did that conversation come up though?
Mr. Blythe: What were you doing at a diner in Bethesda?
C.D.: I go every Tuesday morning after rescue squad
C.D.: I'm at regency right now. Quite a few cuties here.
Mr. Blythe: I asked him if he had a girlfriend, and he said, "no." Then he said that he has never had a girlfriend.  Then, I asked him if he had ever had sex before, which he sheepishly re[p]lied, "no" to.
Mr. Blythe: I will be at Regency at 2pm.
Mr. Blythe:  How long will you be there?
C.D.: Probably till 11
C.D.: Did you ask if he'd had a bf?
C.D.: Going to [*name of local spa*] at 5
C.D.: Wanna join?
Mr. Blythe: Will I get to see you naked?
C.D.: Yep
Mr. Blythe: Will I be able to play with your little wee-wee?

On text messages dated September 9, 2024, and September 10, 2024, the following text

exchange occurred between Mr. Blythe and C.D.:

Mr. Blythe: victorXXXXXXX@gmail.com
C.D.: I sent you something nice in Mega to have a look at
Mr. Blythe: Ok. Thanks.

AT&T was identified as the service provider for the telephone number utilized to

communicate with C.D., 202-276-XXXX.  In response to legal process, AT&T reported Mr. Blythe as the subscriber of the account associated with telephone number 202-276-XXXX.  The subscriber address associated with the AT&T account is Mr. Blythe's residence located in Washington, D.C.

According to open-source research, Mr. Blythe is a licensed clinical social worker who specializes in the mental health field, specifically working with children and adolescents.  Mr. Blythe previously spent seven years in the Psychiatry department at Children's National Medical Center in Washington, DC.

## II.    The Execution of the Search Warrant

On August 11, 2025, the District of Columbia District Court Magistrate Judge Moxila Upadhyaya issued a search warrant to search Mr. Blythe's residence in Washington, D.C. in case number 25-sw-224.  During the execution of the search, two individuals were identified within the premises, Mr. Blythe and a relative.  Per Federal Bureau of Investigation (FBI) policy, agents wore body-worn cameras (BWCs) during the initial execution of the search warrant.  The BWCs were deactivated after the scene was secured, per FBI policy.

Mr. Blythe was detained while agents secured the scene, which is standard procedure.  Mr. Blythe was handcuffed, walked out of the home, and stood near a vehicle with an agent.  At the time, Mr. Blythe had a shirt and no pants on.  Mr. Blythe's relative would not come out of the basement of the home.  Eventually, officers also took the relative out of the house, in handcuffs.  Once the house was secure, Mr. Blythe was escorted back in the home and allowed to put on a pair of pants.  His handcuffs were removed, and he was placed in a sitting room.  Agent Blake Frohnapfel advised Mr. Blythe that they were executing a search warrant and discussed procedures of the search warrant, such as how long it would take.   Agent Frohnapfel was sitting in a chair near Mr. Blythe and spoke to him in a conversational tone.

Agent Frohnapefel asked Mr. Blythe if he could speak to him about underlying basis for the warrant. Mr. Blythe agreed. Agent Frohnapfel said they could talk in the home or outside in a vehicle. Mr. Blythe chose to talk in the vehicle, and the two walked out together.. A second agent also went with them to a Ford Expedition. Agent Frohnapfel and Mr. Blythe sat in the back seat, and Agent Matt Lee sat in the front seat. The vehicle did not have a cage divide like a standard law enforcement vehicle. Agent Frohnapfel read his Miranda rights. Agent Frohnapfel advised him the nature of the charges. Mr. Blythe ultimately said he did not want to speak without a lawyer.

Agents explained that Mr. Blythe could stay in the home but would not be able to walk freely around the home as the search warrant was executed. They told him he could also leave the premises but that he could not return to the home until the search warrant execution was finished for officer safety. Mr. Blythe chose to return to the home and went, with agents, back to the sitting room. Agent Frohnapfel asked Mr. Blythe if he could get him some water, to which Mr. Blythe agreed; otherwise, Mr. Blythe was quiet.

Within ten minutes of Mr. Blythe going back to the sitting room, agents had identified electronic devices and approached Mr. Blythe. Initially, only Agents Frohnapfel and Griffith were in the room.[5] Agent Tonya Sturgill Griffith advised Mr. Blythe that the warrant permitted them to hold the phone up to his face. Agents did not ask if FaceID opened the phone. Agents did not ask how to get into the phone. Mr. Blythe attempted to turn his face away from Agent Griffith and said he did not want to comply with turning his face towards the phone. Agent Frohnapfel then discussed paragraph 49 of the warrant, concerning biometric information, with Mr. Blythe. Agent Frohnapfel advised Mr. Blythe that the warrant authorized them to hold the phone to his face. Agent Griffith tried to hold up the phone again, and Mr. Blythe entered the password, saying something to the effect

---

[5] Other agents may have passed through the room while executing the warrant.

of "it would be easier this way." He did not state the password. Throughout this discussion, Agents Griffith and Frohnapfel maintained a calm demeanor and spoke to Mr. Blythe in a conversational tone.

Agents then attempted to access Mr. Blythe's computer using the same process. At that point, Detective Blake Allbritton from Fairfax County was also present. They again told Mr. Blythe that the warrant permitted them to hold the computer to his face. Agents tried to use FaceID by holding the computer up to Mr. Blythe's face, but it did not work. Agent Frohnapfel tried to exit out of the passcode to get back to FaceID, and then Mr. Blythe took computer and entered the password. As this interaction occurred, Detective Blake Allbritton from Fairfax County began to record the interaction on his cellphone. Detective Allbritton believed that the video (Exhibit 1) could capture Mr. Blythe's password as he entered it. Agent Frohnapfel stood next to Mr. Blythe and saw him enter the password. Agent Frohnapfel observed the numbers that Mr. Blythe used in the password.

After Mr. Blythe entered his computer password, Agent Griffith approached him again with the cell phone because the phone had locked. She said, "I need your face again on your phone." A man offscreen said, "Or you can do password. Whatever is easier for you." At that point, Mr. Blythe entered his password on his phone. At no point during the encounter did Mr. Blythe ever state his passcode to agents nor did agents ask for his passcode. Following the second unlock of the phone, agents did not attempt to unlock any additional devices on scene.

Mr. Blythe's password to both his cell phone and computer was his date of birth.

### III.    Procedural History

Mr. Blythe was arrested on August 12, 2025,  and charged by complaint with Distribution of Child Pornography, in violation of 18 U.S.C. § 2252(a)(2), and Possession of Child Pornography, in violation of 18 U.S.C. § 2252(a)(4).  On August 28, 2025, the defendant was indicted on one count of Distribution of Child Pornography, in violation of 18 U.S.C. § 2252(a)(2), and one count of

Possession of Child Pornography, in violation of 18 U.S.C. § 2252(a)(4).  A motions hearing is set for October 26, 2025.

## LEGAL BACKGROUND

The defendant asks this Court to suppress all evidence found on Mr. Blythe's phone based on an argument that the warrant and its execution were unconstitutional.  The defendant asks this Court to narrow the decision in *Brown* such that it would be impossible for law enforcement officers to ever obtain biometric information without the defendant's express consent.

"To qualify for Fifth Amendment privilege, a communication must be testimonial, incriminating, and compelled." *Hiibel v. Sixth Jud. Dist. Ct. of Nevada, Humboldt County*, 542 U.S. 177, 189, 124 S. Ct. 2451, 159 L. Ed. 2d 292 (2004).  In *Brown*, the D.C. Circuit considered the issue of whether "disclosing to police [appellant's] way of opening the cellphone and his ability to do so was testimonial." *Brown*, 125 F.4th at 1201.   In *Brown*, the case agent could not recall his conversation with the appellant, and the district court determined the case agent "ordered [appellant] to open the cellphone, and [appellant] complied by placing his thumb on the cellphone." *Id.* at 1202. Suppression in *Brown* turned not only on the fact that the action was testimonial but that law enforcement *ordered* the defendant to open the phone:

> Because the FBI directed [appellant] to open the phone, the government compelled [appellant] to disclose his knowledge of how the phone could be opened, and specifically his understanding that his thumb would unlock the device, and those disclosures revealed his ownership or control over the phone and the messages it contained.

*Id.* at 1203-04.  The defendant's action was "in response to the command to unlock the phone." *Id.* at 1204.  Thus, in determining that the defendant's response was "testimonial," they found that the response was subject to Fifth Amendment protection because it was also incriminating and compelled.

Notably, the Court distinguished *Brown* from the Ninth Circuit case *United States v. Payne*,

99 F.4th 495 (9th Cir. 2024). In *Payne*, the defendant refused to give officers his passcode, and an officer "grabbed [his] thumb and unlocked the phone." *Id*. at 507. The Ninth Circuit held that the use of the defendant's thumb was compelled: "[h]e was physically restrained, in the back of a squad car, and had already refused to provide officers with the passcode to unlock the phone." *Id.* at 508. Nonetheless, the Ninth Circuit found that this action was not testimonial. The Court compared the use of the defendant's thumb to a blood draw or fingerprint booking. *Id.* at 509. "These actions do not involve the testimonial capacities of the accused and instead only compel an individual to provide law enforcement with access to an immutable physical characteristic." The Court continued:

> To say that a passcode and a biometric are equivalents and thus cannot receive different treatment under the law is a syllogistic fallacy. The logic goes: biometrics are the equivalent of or a substitute for a passcode and passcodes are protected under the Fifth Amendment, so, biometrics are also protected under the Fifth Amendment. The flaw lies in the fact that the Supreme Court has framed the question around whether a particular action requires a defendant to divulge the contents of his mind, not whether two actions yield the same result. *See Hubbell*, 530 U.S. at 43. The functional equivalent argument attempts to make an end run around this central piece of the Fifth Amendment inquiry. When Officer Coddington used Payne's thumb to unlock his phone—which he could have accomplished even if Payne had been unconscious—he did not intrude on the contents of Payne's mind.

*Id*. at 511.

Since *Brown* and *Payne*, there have been two non-binding decisions issued across the country which address this issue. In *United States v. Gilkey*, the Army Court of Criminal Appeals, citing *Payne* and *Brown*, found that investigators violated the Fifth Amendment when they "asked appellee a question which resulted in appellee taking affirmative, cognitive steps that informed CID how to unlock the phone and granted access to the contents within it." *Gilkey*, 2025 CCA LEXIS 86 at 24 (2025). The Court distinguished *Gilkey* from *Payne* by noting, "CID did not hold the phone up to appellee's face to unlock the phone, similar to forcibly grabbing a thumb to unlock the cell phone as was done in *Payne*." *Id.*

Similarly, in *People v. Manganiello*, 2025 N.Y. App. Div. LEXIS 4009 (N.Y. App. Div. 4th

Dept. 2025), the Court held that the defendant's action of unlocking a cell phone was "testimonial" when the defendant was told "the warrant required him to unlock his cell phone, and defendant unlocked the cell phone by placing the tip of one of his fingers on the phone, which unlocked the device." *Id.* at 3. The Court noted that the defendant opened the phone "in response to the command to unlock the phone." *Id.* at 9-10.

## ARGUMENT

### I.    The Warrant Was Valid On Its Face.

The language in the warrant is consistent with the holding in *Brown*. The warrant provides that law enforcement are authorized to unlock the electronic devices "(1) by pressing or swiping fingers or thumbs of the aforementioned person against the fingerprint scanner or any such device(s) and/or (2) by holding in front of the face of the aforementioned person to activate the facial recognition or iris recognition feature of any such Device(s)." It goes on to specify that law enforcement may *not* demand a password or specific biometric provision.

Contrary to the defendant's argument, the warrant did not compel the defendant to provide "biometric password information." Mot. at 6. Rather, the warrant permitted, in accordance with *Brown*, law enforcement to obtain purely physical trait – either a forced fingerprint, as in *Payne*, or facial recognition. Accordingly, because the language in the warrant acknowledges the limitations in *Brown*, the warrant language is constitutional.

The defendant also argues that the warrant is "without precedent" and "unconstitutional" because it allowed law enforcement to use "biometric passwords" to unlock devices where there was, "reasonable suspicion that [Mr. Blythe's] physical biometric characteristics [would] unlock the device." Mot. At 6. The defendant argues that there is no authority for the government to compel "biometric passwords" based on reasonable suspicion that the person possesses those passwords, and that there is no authority to "delegate to law enforcement the determination of whether such

16

reasonable suspicion exists." *Id.* The defendant fails to acknowledge, however, that this language has been standard in search warrants issued by magistrate judges throughout the courthouse for years. In *Matter of Search of [Redacted] Washington, District of Columbia*, 317 F. Supp. 3d 523, 532 (D.D.C. 2018), Magistrate Judge Harvey issued an opinion regarding the standard for compelling a display of biometrics to unlock a device, drawing a distinction between more intrusive searches such as blood draws, which require probable cause, and less intrusive searches like fingerprinting, which require reasonable suspicion. Magistrate Judge Harvey likened the compelled use of biometrics to fingerprinting and stated in part:

> [T]he government may compel the use of an individual's biometric features, if (1) the procedure is carried out with dispatch and in the immediate vicinity of the premises to be searched, and if, at the time of the compulsion, the government has (2) reasonable suspicion that the suspect has committed a criminal act that is the subject matter of the warrant, and (3) reasonable suspicion that the individual's biometric features will unlock the device, that is, for example, because there is reasonable suspicion to believe that the individual is a user of the device…Future government requests for authorization to compel the use of an individual's biometric features as part of a search warrant seeking to seize evidence on digital devices should comply with that standard.

Magistrate Judge Harvey's reasoning still stands following the *Brown* decision and allows agents to compel biometrics based on reasonable suspicion that the individual's biometrics will unlock the device the agent is attempting to access.

## II.    The Agents Lawfully Executed the Warrant.

The agents in this case properly executed the warrant, following the guidance laid out in *Brown*. Unlike the instant matter, in *Brown*, agents were executing both an arrest and search warrant of the defendant's residence. At the time of his interaction with agents regarding biometrics, the defendant in *Brown* was in police custody. In *Brown*, agents asked the defendant for the password to his cell phone after the defendant had been arrested pursuant to a warrant and placed in an FBI vehicle. *Brown*, 125 F.4th at 1200. The defendant gave multiple passwords, which did not work. *Id.*

The agent said his ordinary practice would be to ask the person in custody if they wanted to have any number accessed so they could be used at the jail. *Id.* In response to this, the defendant put his thumb on the phone and opened it. *Id.* The Court found that the compelled opening of the defendant's cellphone was testimonial, noting that the defendant "was ordered to open the cellphone." *Id.* at 1202. Later, they noted that the FBI "directed" the defendant to open his phone, which "compelled [appellant] to disclose his knowledge of how the phone could be opened, and specifically his understanding that his thumb would unlock the device, and these disclosures revealed his ownership or control over the phone and the messages it contained."

It is important to stress that the Constitutional issue arises based on the government's *action*, rather than the defendant's *reaction*. Here, the law enforcement actions are permissible because they sought a non-testimonial, physical trait—Mr. Blythe's face, which was clearly allowed pursuant to the search warrant. Mr. Blythe's subsequent reaction was spontaneous and voluntary. The agents did not ask Mr. Blythe to open the phone. They did not ask him for a passcode or a thumb print. Rather, agents told Mr. Blythe that, in accordance with the warrant, they were going to hold the phone up in front of his face in an attempt to open it. When Mr. Blythe attempted to move his head and said he did not want to do that, agents again told him they would put the phone in front of his face. At that point, Mr. Blythe entered the passcode on the phone and said something to the effect of, "it'll be easier this way." Mr. Blythe's choice to enter his password was not the result of a question or request by law enforcement. This case is more analogous to *Payne*. As in *Payne*, where the Court found no issue with agents taking the defendant's thumb print and physically placing it on the phone, there is no issue here where agents attempted to use Mr. Blythe's face to trigger the FaceID on the cell phone.

The defendant argues that his response to law enforcement was forced. The Supreme Court has indicated that the inquiry into whether a statement is obtained voluntarily should be determined

with reference to the totality of the circumstances, and that the ultimate question is whether the suspect's "will [has been] overborne" by "coercive police activity." *Colorado v. Connelly*, 479 U.S. 157, 167, 178 n.2 (1986). If there is no coercive police activity, a statement is considered voluntary. *Connelly*, 479 U.S. at 167; *Baird v. United States*, 851 F.2d 376, 382 (D.C. Cir. 1988). If a suspect gives a statement solely as a result of an internal condition, e.g., insanity or intoxication, there also is no violation. *Connelly*, 479 U.S. at 167. *Compare United States v. Hallford*, 816 F.3d 850, 856 (D.C. Cir. 2016) (no coercive police conduct where defendant agreed to an interview with agents, agents asked "straightforward" questions in "conversational tones"; defendant was not restrained; interview lasted less than an hour; defendant questioned in a hospital and not in a police-dominated atmosphere; defendant was not tricked into answer questions; defendant's refusal to consent to a search of his vehicle showed his will was not overborne), *with Little v. United States*, 125 A.3d 1119, 1133 (D.C. 2015) (defendant chained to the ground and chair, denied counsel when requested, threatened that he would be raped if he went to jail, and accused of crimes officers knew he did not commit, was coerced into confessing).

The defendant argues that the "actions of law enforcement forced [him] to communicate incriminating information." Notably, when Mr. Blythe was presented with the phone, he had already been advised of his *Miranda* rights, he had been advised he could leave the premises while the search was ongoing but could not return during the search if he chose to leave. More importantly, the conditions described by the defendant are present in almost all search warrant executions—it cannot be that the mere fact that a search warrant is executed at one's home renders all of their actions involuntary.

Second, the defendant argues that showing the warrant attributed to his coercion. However, the warrant was a valid legal process. Again, it cannot be that showing a suspect the legal process by which officers have entered his home automatically render future actions involuntary. Moreover,

the warrant authorized agents to compel the display of Mr. Blythe's biometrics to unlock devices. In order to effectuate that provision in the warrant, it is reasonable to expect agents to show the target of an investigation a copy of the search warrant to confirm that they have court authorization to compel biometrics.

The defendant argues that he "gave up" and entered the passcode.  As stated above, agents did not ask the defendant for the passcode.  This did not take place after hours of attempting to access the phone.  Rather, agents attempted to trigger the FaceID, Mr. Blythe refused, the agents presented him with the warrant, and then they tried a second time. It was at that point that Mr. Blythe, unprompted by any statements from the agents, took his phone and ultimately his laptop and entered the passcode.

The defendant further argues that officers violated the warrant provision that prohibited them from "demand[ing] that the aforementioned person state or otherwise provide the password or identify the specific biometric characteristics … that may be used to unlock or access the Device(s)." As established, agents did not ask for the passcode.  They did not even ask if FaceID was the appropriate way to open the phone; the government anticipates agents will testify that they assumed that FaceID was an appropriate way to open the phone based on the type of cellphone.  Agents never told Mr. Blythe that he was required to give his passcode, nor did they ask him how he accessed the phone.

Law enforcement agents are permitted to obtain warrants pursuant to the Fourth Amendment to obtain biometric information.  The defendant asks this Court to so narrowly constrain the ruling in *Brown* that it would eliminate any meaning to a biometrics provision in a warrant.  If an agent cannot simply tell a defendant that they are going to attempt to use the person's face for FaceID—without asking any questions, requesting any passcodes, etc.—there is essentially no way for agents to get biometric information without a defendant's express consent.  This cannot be what the holding in

*Brown* intended to find.

### III.    Even if the Agents Did Not Lawfully Execute the Warrant, Agents Would Have Inevitably Discovered the Evidence on the Phone.

Even if this Court finds that the agents obtained Mr. Blythe's biometrics information in violation of the Fifth Amendment, the evidence contained on the cellphone is nonetheless admissible under the inevitable discovery doctrine.

"The inevitable-discovery doctrine allows for the admission of evidence that would have been discovered even without the unconstitutional source." *Brown*, 125 F.4th at 1205 (internal quotation marks omitted) (citing *Utah v. Strieff*, 579 U.S. 232, 238, 136 S. Ct. 2056, 195 L. Ed. 2d 400 (2016); *Nix v. Williams*, 467 U.S. 431, 448, 104 S. Ct. 2501, 81 L. Ed. 2d 377 (1984). The government bears the burden of proving by a preponderance of the evidence that the evidence would have been discovered independently of the Fifth Amendment violation. *Nix*, 467 U.S. at 444-445 n.5.

In *Brown*, the Court rejected an inevitable discovery argument when the government argued that it would have confirmed the defendant's ownership of the phone when it obtained a second search warrant seven months later. *Brown*, 125 F.4th at 1205. The Court noted that the government's second search warrant "relied on the Fifth Amendment violation—that [appellant's] thumbprint unlocked the phone—and the inculpatory text messages the phone contained to establish probable cause for that later warrant." *Id.*

This case is distinguishable. Mr. Blythe's password to both his cellphone and his computer was his six-digit date of birth. The government anticipates that the case agents will testify that a suspect's date of birth is one of the most commonly used passwords and that agents would have used that option in attempting to open the phone. Further, even if agents had not entered the date of birth on the phone on-scene, extraction software would have been able to get into the phone based on the simplicity of the password.

### a. Agents Would Have Entered the Defendant's Date of Birth as a Potential Passcode.

The case agents will testify that when they are attempting to open an electronic device on scene, there are a certain number of attempts they can enter before the phone will shut down, which depends upon the make and model of the phone. Agents will testify that a suspect's own birthday is one of the most common passwords used, and agents commonly will try a suspect's date of birth, depending on how many attempts they have with the password. They may also attempt the date of birth of other family members, such as a spouse or child.

If Mr. Blythe had continued to refuse to cooperate with law enforcement, and agents were unable to access his devices via FaceID, agents would have attempted to enter his date of birth in his cellphone and computer. Thus, agents would have been able to access his phone and computer on-scene.

### b. Agents Would Have Accessed the Cellphone via Graykey Software.

In addition, if agents did not attempt to access the phone on scene, they would likely have been able to access the phone via the software used to extract cellphones. One of these products is Magnet Graykey ("Graykey"). Graykey, and other software programs, routinely have updates to allow them to access devices. Graykey will work in a number of ways: first, it may attempt to see what data it can get without needing the passcode at all. Second, it will also attempt to decrypt the device. Agents can enter in "hints," including personal information, which can assist Graykey in determining the passcode. Given that Mr. Blythe's password was his birthdate, if that information had been entered into Graykey, agents would have been able to gain access to the phone. *Cf. United States v. Raymond*, 2023 WL 7005341, *12 (D.D.C. 2023) (rejecting the government's inevitable discovery argument where government agents compelled the defendant's passcode after he refused to provide it voluntarily, the defendant created a new passcode for the agents to maintain access to

his phone, and agents testified that the "brute force" method they must otherwise use to break into a phone could take years to determine the correct passcode).

## IV.    The Agents Acted in Good Faith.

In *Brown*, the Court rejected a good faith argument, in part because "at no point did the officer claim to have relied upon the warrant or any other relevant legal authority empowering him to compel [appellant] to open his phone." *Id.* at 1206. The Court noted that the warrant expressly withheld authority to "demand" that the defendant provide the password or identify the specific characteristics. In the instant case, however, the agents were relying upon the language of the warrant which allowed the compelled display of biometrics for any devices agents had reasonable suspicion to believe belonged to the defendant. The agents' intent was clear from their conduct: to compel the display of the defendant's biometrics to unlock his devices, actions that were allowed under the plain language of the warrant. The defendant's unsolicited response in entering his passcode was not the result of any statement or actions by the agents. Therefore, the agents acted in good-faith reliance on the plain language of the warrant when compelling the defendant's biometrics.

## <u>CONCLUSION</u>

For the foregoing reasons, the government respectfully requests that this Court deny the defendant's motion to suppress.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

Dated: October 8, 2025        By:    */s/ Rachel Bohlen*
Rachel Bohlen
D.C. Bar No. 1010981
Assistant United States Attorney
United States Attorney's Office
for the District of Columbia
601 D Street NW
Washington, DC 20530

23

(202) 809-3575
rachel.bohlen@usdoj.gov