UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| v. | :     25-cr-253 (DLF) |
| VICTOR RENATO BLYTHE | : |

**DEFENDANT'S REPLY TO GOVERNMENT'S RESPONSE TO DEFENSE NOTICE OF ADDITIONAL AUTHORITY**

Victor Blythe, through counsel, respectfully submits this reply to the government's response (ECF No. 32) pursuant to the Court's minute order issued on October 23, 2025, and in further support of Mr. Blythe's motion to suppress evidence.

The government submitted a combined response in ECF No. 32 to several of the Court's requests for additional briefing. Mr. Blythe has submitted ECF No. 35, which already addresses some of the issues in the government's combined response. This response by Mr. Blythe will focus on the two remaining issues argued in ECF No. 32, which are (1) whether there was a Fourth Amendment violation because the detention exceeded the scope of search warrant executions, and (2) whether there was an additional Fifth Amendment violation because agents violated Mr. Blythe's Miranda rights.

**I.     Mr. Blythe's detention transformed into a custodial arrest and therefore he was unlawfully seized in violation of the Fourth Amendment**

The government argues that the Court should operate in a vacuum rather than consider the totality of the circumstances on August 12, 2025, and how any reasonable person in Mr. Blythe's situation would not feel free but rather would believe they were in custody. Mr. Blythe does not argue that law enforcement was not permitted to temporarily detain him for purposes of executing the search warrant. Rather, he argues that what happened on August 12, 2025, went far beyond that limited permissible detention and quickly entered into a full-blown custodial arrest.

As an initial matter, the government's suggestion that Mr. Blythe was free to leave is contradicted by the facts and by Supreme Court case law that acknowledges that at a minimum, individuals are not free to leave while agents rummage through their belongings in their home. *Michigan v. Summers*, 452 U.S. 692, 696 (1981) (record demonstrates that respondent not free to leave premises while officers were searching his home). Mr. Blythe goes a step further and argues that not only was he clearly not free to leave, but that the "limited intrusion" that *Summers* permitted transformed into an impermissible custodial arrest. The fact that Agent Frohnapfel insisted that Mr. Blythe was free to leave just undermines his credibility in assessing what happened that day.

The government relies on *Summers* and other cases that are distinguishable from Mr. Blythe's case. When the Court in *Summers* discussed the search warrant "exception" that warrants a limited intrusion, the Court put this exception into context by discussing how this intrusion in certain scenarios "may be justified by special law enforcement interests," for example in "minimizing harm to officers," and "preventing flight." *Summers*, 452 at 699-705. "Whether these law enforcement interests can justify a seizure depends on the intrusiveness of the seizure." *Leveto v. Lapina*, 258 F.3d 156, 167 (3d. Cir. 2001). The Third Circuit in *Leveto* discusses *Summers* and

how the Supreme Court only created a general rule with regards to searches for contraband, however the Court did not decide whether this rule would apply "if the warrant authorized a search for evidence rather than contraband." *Id*. at 168. *See also Summers*, 452 U.S. 705 n. 20 (We do not decide whether the same result would be justified if the search warrant merely authorized a search for evidence). In *Leveto*, the search warrant authorized the seizure of evidence based upon suspected IRS fraud. *Id*. at 156. The Court found that Dr. Leveto's detention was unreasonable because his seizure "did little to advance the law enforcement interests that were found to justify the detention in *Summers*." *Id*. at 170. The Court found that the search for contraband much more often leads to an immediate arrest whereas the search for documents does not typically do so and therefore the risk that the suspect will flee is far greater in the search for contraband. *Id*. Because there was also no threat of violence based upon the allegations and Dr. Leveto's history, there was also no compelling safety reason of detaining him for that long. *Id*. at 171.

      Likewise, the search warrant executed in this matter was for evidence, electronic devices, and not for drugs or weapons. There was no indication that Mr. Blythe would flee or posed a threat to law enforcement. The fact that Mr. Blythe was forced to remain naked for almost 20 minutes, was taken to and from FBI vehicles multiple times, then forced to provide his passcode after invocation of counsel is not justified by any law enforcement interest. *Id*. at 160 (fact that Dr. Levato was moved from his office back to his home in FBI vehicle, was patted down for weapons, and detained for several hours all contributed to finding of unreasonable intrusion). Even after Agent Frohnapfel advised Mr. Blythe that he was "free to leave," that was said in the midst of his continued unreasonable detention where his movements had been restrained and were being restrained in an FBI vehicle surrounded by two armed agents. This advisement was also given after he was given custodial *Miranda* warnings and right before he was about to be interrogated and

compelled to unlock his cell phone. Agent Frohnapfel's words were essentially meaningless when compared to law enforcements actions that day. Mr. Blythe's feelings of still being detained even when his handcuffs were allegedly removed are corroborated by the fact that he asked agents got him a glass of water in his own home. *See* Ev. Hearing Trans. at 41. Mr. Blythe was not even free to get a cup of water the same way he was not free to refuse providing his passcode. At that point, agents detained him not for the purpose of executing a warrant but for the purpose of seeking incriminatory information.

In *United States v. Mittel-Carey*, 456 F.Supp.2d 296 (D. Mass. Oct. 20, 2006), a district court judge held that the FBI agents' interrogation of the defendant exceeded the scope of detention authorized during the execution of the warrant. Notably, the Court explained that officers are not permitted to "use the suspect's detention to their official advantage by attempting to extract self-incriminating statements form the suspect." *Id*. at 302. The defendant in *Mittel-Carey* was suspected of similar charges as the instant case and police interrogated him during the execution of the warrant. *Id*. at 300. The defendant was secluded in his living room with two agents while others were participating in the search of his residence. Like Mr. Blythe, he also had to ask permission for ordinary things like using the bathroom. *Id*. at 301. The district court in *Mittel-Carey* rejected the government's argument that this was a *Summers* type detention and said:

> [The agent's] inquiry did not seek Mittel-Carey's assistance in opening locked compartments. Rather, [the agent] asked Mittel-Carey to inculpate himself. In this light, to authorize the [agent's] inquiry would be to read *Summers* as carving out, sub silentio, a significant exception to *Miranda*. Such an argument must be rejected in light of the observation in *Summers* that such detentions are "not likely to be exploited by the officer or unduly prolonged in order to gain more information, because the information the officers seek normally will be obtained through the search and not through the detention."

*Id*. at 304 (quoting *Summers*, 452 U.S. at 701). Similarly, law enforcement clearly had an agenda to get more information out of Mr. Blythe not only by isolating him in an FBI vehicle but also by

4

compelling him to unlock his phone. Notably, there were only 8 federal agents in the *Mittel-Carey* search while there were 26 agents that surrounded and remained in Mr. Blythe's residence. *Id*. at 305 (number of law enforcement officers present relevant as to whether defendant felt he was in custody). The Court found that while Mittel-Carey was in his home, the atmosphere was completely police dominated and that he was secluded from his girlfriend. *Id*. at 306. Furthermore, the agents made Mittel-Carey aware of the evidence against him and gave him the impression he was about to go to prison. *Id*. at 308. Based upon all the circumstances, the Court found that a reasonable person in Mittel-Carey's situation would have believed that he was under arrest. *Id*. at 309.

Similarly, everything about the morning of August 12, 2025, communicated to Mr. Blythe that police dominated the atmosphere and that he was not free to go anywhere. This detention continued as a "domino effect" all the way up until agents compelled him to open his phone. Mr. Blythe repeatedly asked for pants, was moved from the house to a police vehicle, then moved back inside the house, then back to a police vehicle, then isolated from his brother and not even being able to get a cup of water on his own. While inside a police vehicle, Mr. Blythe was essentially told he was going to prison based upon the evidence they discovered. Even after Mr. Blythe asked for a lawyer, one was not provided and instead he was compelled to unlock his phone.

For all these reasons, Mr. Blythe's detention was not temporary just to secure the scene and rather was unreasonable and was unlawful under the Fourth Amendment.

**II.     Because Mr. Blythe was seized, agents violated his *Miranda* rights by interrogating him prior to giving him warnings and then compelling him to provide his passcode after he invoked his right to counsel**

Mr. Blythe's Fifth Amendment rights were also violated for many of the same reasons discussed above. Because Mr. Blythe was in custody, police should not have questioned him while

he was handcuffed, naked, and forced to stand by a police car. *United States v. Salyers*, 160 F.3d 1152, 1159 (7th Cir. 1998) ('custody' is established when an individual's freedom of movement is restrained to the degree of a formal arrest). For the same reasons that the Court in *Mittel-Carey* found that the defendant was in custody for purposes of *Miranda* as discussed above, the Court here should also find that the circumstances would lead a reasonable person in Mr. Blythe's situation to believe that his "freedom of action was restrained," and any statements he made when he was standing next to an FBI vehicle, naked, and in handcuffs and statements made thereafter should be suppressed. *Mittel-Carey*, 456 F.Supp.2d at 308-309.

Furthermore, after *Miranda* warnings were given to Mr. Blythe in an FBI vehicle with two agents interrogating him, agents should have respected his clear invocation of counsel and ceased *acting* in a way that would likely lead to an incriminatory response. Contrary to the government's argument, he was also in custody in that FBI vehicle surrounded and isolated by two FBI agents who were armed. It was a continuation of the custodial situation he was already in before stepping foot into that vehicle and when agents gave him his *Miranda* warnings, it became even more clear to Mr. Blythe that he was in custody.

The government failed to address *Rhode Island v. Innis* in any meaningful way. The Supreme Court was clear that "interrogation" is not just words but *actions* on the part of the police that police should know "are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291 301 (1980) (emphasis added). The government argues that because a magistrate judge has said compulsion of biometrics is non-testimonial, the agents' actions in compelling Mr. Blythe to provide his passcode do not violate *Miranda*. Firstly, the government again ignores *Brown*, the leading precedent on this issue, which has said the opposite. *United States v. Brown*, 125 F.4th 1186 (D.C. Cir. 2025). Secondly, the agents did not

6

even follow what the magistrate judge's search warrant instructed them to do. The agents knew or should have known that making him unlock his phone would lead to an incriminating response. Mr. Blythe not only turned his face away but also closed his eyes. Common sense dictates that that if officers hold a phone up to someone's face two times while telling someone that there is a court order that mandates his Face ID, that the person's reactions are likely going to lead to an incriminating response. The government would not be debating this had the agents engaged in "express questioning" merely asking him for his passcode, but they did the very same thing by their actions and the law makes no distinction between the two. Agent Frohnapfel testified that Face ID is a more convenient way to unlock a phone. Ev. Hearing Trans. at 77. FaceID is a passcode, it is just a more modern password. *Brown* did not distinguish between the two and neither should the Court. *Brown*, 125 F.4th at 1202-1203.

## Conclusion

For all the reasons stated above, the Court should suppress evidence found as a result of violations of Mr. Blythe's Fourth and Fifth Amendment rights to the Constitution.

    Respectfully submitted,

    A. J. KRAMER
    FEDERAL PUBLIC DEFENDER

      /s/
    _____

    Maria N. Jacob
    Assistant Federal Public Defender
    625 Indiana Avenue, N.W., Suite 550
    Washington, D.C.  20004
    (202) 208-7500