# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>VICTOR RENATO BLYTHE,<br><br>*Defendant.* | No. 25-cr-253 (DLF) |

## MEMORANDUM OPINION AND ORDER

Victor Blythe is charged with distribution of child pornography, in violation of 18 U.S.C. § 2252(a)(2), and possession of child pornography, in violation of 18 U.S.C. § 2252(a)(4). Before the Court is Blythe's motion to suppress evidence discovered as a result of the search of an iPhone seized from his residence. *See* Dkt. 22. For the reasons that follow, the Court will deny the motion.

## I.    BACKGROUND[1]

The FBI's Child Exploitation and Human Trafficking Task Force first became aware of Blythe when it received from the Fairfax County Police Department information related to an individual the Department had arrested, "C.D.," with whom Blythe had been communicating. Tr. of Evidentiary Hr'g 18:8–25. In particular, the Department provided the Task Force with electronic messages between C.D. and Blythe that discussed their sexual interest in minors and appeared to involve the exchange of child sexual abuse material. *Id.* at 18:17–25.

---

[1] The Court held an evidentiary hearing on Blythe's motion to suppress on October 23, 2025. The Court stated its factual findings on the record on November 13, 2025, before hearing argument on the motion. This opinion highlights those factual findings that are most pertinent to this decision.

The FBI obtained a search warrant for Blythe's residence in Northwest D.C. *Id.* at 19:18–

20:8. The search warrant permitted agents to seize electronic devices, including cellphones. Gov't

Ex. 1, at 6–9 ("Warrant"). As to those devices, the warrant provided:

> During the execution of the search of the PREMISES . . . law enforcement personnel are also specifically authorized to obtain from Victor Renato BLYTHE (but not any other individuals present at the PREMISES at the time of execution of the warrant) the compelled display of any physical biometric characteristics (such as fingerprint/thumbprint, facial characteristics, or iris display) necessary to unlock any Device(s) requiring such biometric access subject to seizure pursuant to this warrant for which law enforcement has reasonable suspicion that the aforementioned person(s)' physical biometric characteristics will unlock the Device(s). Law enforcement are authorized to attempt to unlock any such Device(s)'s security features in order to search the contents as authorized by this warrant by compelling the display of such a physical biometric characteristic; that is, (1) by pressing or swiping the fingers or thumbs of the aforementioned person against the fingerprint scanner of any such Device(s) and/or (2) by holding in front of the face of the aforementioned person to activate the facial recognition or iris recognition feature of any such Device(s).

*Id.* at 9. At the same time, the warrant contained the following restriction:

> While attempting to unlock the device by use of the compelled display of biometric characteristics pursuant to this warrant, law enforcement is not authorized to demand that the aforementioned person state or otherwise provide the password or identify the specific biometric characteristics (including the unique finger(s) or other physical features), that may be used to unlock or access the Device(s). Nor does the warrant authorize law enforcement to use the fact that the warrant allows law enforcement to obtain the display of any biometric characteristics to compel the aforementioned person to state or otherwise provide that information. However, the voluntary disclosure of such information by the aforementioned person is permitted. Specifically, [if] agents in executing the warrant ask any of the aforementioned person[(s)] for the password to any Device(s), or to identify which biometric characteristic (including the unique finger or other physical features) unlocks any Device(s), the agents will not state or otherwise imply that the warrant requires the person to provide such information, and will make clear that providing any such information is voluntary and that the person is free to refuse the request.

*Id.* at 9–10. In other words, under the terms of the search warrant, agents could compel the display

of Blythe's physical biometric characteristics, but they could not (1) order Blythe to unlock a

device; or (2) ask Blythe for information regarding how to unlock the device, or state or imply that

the warrant required him to provide such information. Materially similar parameters were detailed

in paragraphs 49 and 58 of the affidavit in support of the warrant application. *Id.* at 42–43, 45–46. The terms of the search warrant required the FBI to execute the warrant within 14 days. *See id.* at 2.

The FBI executed the search warrant at approximately 6:00 a.m. on August 12, 2025. Tr. of Evidentiary Hr'g 23:6–11. FBI Special Agent Blake Frohnapfel—the lead agent investigating Blythe's case—was present on scene, along with over 20 other law enforcement personnel from the FBI, Metropolitan Police Department, and Fairfax County Police Department. *See id.* at 18:8–10, 24:3–23, 57:7–20.

FBI agents approached the residence with weapons drawn. *Id.* at 27:1–13. Agent Frohnapfel carried a rifle and a battering ram; another agent carried a tool that would spread open the door to allow the agents to gain entry to the residence. *Id.* at 27:1–28:19, 58:7–13. Within approximately 20 seconds of first announcing their presence and knocking on the front door, agents began forcibly breaking the door using the battering ram and tool. *See* Gov't Ex. 2, at 2:54–3:27; Tr. of Evidentiary Hr'g 60:22–62:10. After the door had been forced open, Blythe emerged from a room in the back right of the house, wearing only a t-shirt and socks. Tr. of Evidentiary Hr'g 62:11–13, 66:12–17; Gov't Ex. 2, at 3:27–3:47. Agents ordered Blythe to put his hands up and walk backwards toward the door. Gov't Ex. 2, at 3:47–4:20. When Blythe reached the front door, an agent placed him in handcuffs. *Id.* at 4:20–4:45. Agents asked Blythe who else was in the home. *Id.* at 4:45–4:47. Blythe responded that his brother was inside. *Id.* at 4:45–4:48. The agents asked where in the home his brother was located, and Blythe answered that his brother was in the basement. *Id.* at 4:48–4:54. An agent yelled for Blythe's brother, Robert Blythe, to come to the front door. *Id.* at 4:55–5:18.

3

An agent walked Blythe to an unmarked police vehicle parked in front of the residence, where Agent Tonya Griffith—a certified digital extraction technician and the search team lead—waited.  Tr. of Evidentiary Hr'g 33:10–18, 102:8–103:17, 104:7–14; Gov't Ex 6, at 5:10–5:20.  Agent Griffith and another agent, both armed, stood with Blythe as agents secured the home.  Tr. of Evidentiary Hr'g 33:10–18, 106:9–14, 129:10–22, 131:21–132:5.  Agent Griffith advised Blythe that the FBI had a search warrant and that agents would explain more once the home was secure.  Gov't Ex 6, at 5:20–5:34.  Although she denied Blythe's requests to sit inside the vehicle and to go back inside, she positioned Blythe behind the vehicle's door and stood behind him to attempt to provide some privacy and shield him from view.  *Id.* at 5:34–6:15, 11:35–11:45, 14:38–14:45, 15:37–15:42; Tr. of Evidentiary Hr'g 107:12–14.  Agent Griffith asked Blythe whether his brother was in the basement level of the home; Blythe confirmed that he was.  Gov't Ex 6, at 5:34–5:38.  The agents later asked Blythe to describe the location of his brother's bedroom, and he did so.  *Id.* at 9:15–9:45.

While Agent Griffith and Blythe waited outside, agents continued to secure the home.  Once the main level of the home had been cleared, a group of agents exited the residence and went to a basement level entrance in the rear of the home.  Tr. of Evidentiary Hr'g 32:1–22; Gov't Ex. 2, at 8:55–9:40.  An agent called for Robert Blythe to come to that back door.  Gov't Ex. 2, at 9:40–9:52.  Although Robert Blythe emerged from an interior room and was visible through a window, he did not immediately open the door.  *Id.* at 9:55–10:10.  Agents broke open the basement door, handcuffed Robert Blythe, and took him outside of the home.  *Id.* at 10:10–11:15.

Approximately 13 minutes after Blythe was escorted to the vehicle to wait with Agent Griffith, an agent announced that the home was clear.  *See id.* at 5:10, 17:59–18:08; Tr. of Evidentiary Hr'g 68:6–9.  Agent Griffith escorted Blythe—still handcuffed—back inside, bringing

him to a sitting room on the main level of the home.  Tr. of Evidentiary Hr'g 34:11–15, 108:1–16.

She did not advise Blythe that he was free to leave.  *Id.* at 134:14–135:3.  An agent removed his

handcuffs, and Agent Frohnapfel brought him a pair of shorts.  *Id.* at 34:13–20, 108:1–16.

Agent Frohnapfel introduced himself to Blythe and explained that the FBI was executing

a search warrant.  *Id.* at 35:22–36:8.  He told Blythe that he wanted to speak to him and gave him

the option of speaking in the home or outside in a law enforcement vehicle.  *Id.* at 36:2–16, 69:8–

18.  Blythe chose to speak in the vehicle.  *Id.* at 36:9–16, 69:15–18.

Agent Frohnapfel and Blythe were joined in the vehicle by Special Agent Matt Lee.  *Id.* at

36:20–37:2.  The agents made an audio recording of the interview, which lasted approximately 12

minutes.  *See generally* Gov't Ex. 3.  At the outset of the conversation, Agent Frohnapfel explained

that he and Agent Lee worked on the FBI's Child Exploitation and Human Trafficking Task Force

and had a search warrant for Blythe's home.  *Id.* at 0:00–1:35.  Agent Frohnapfel read Blythe his

*Miranda* rights, and the agents explained that Blythe was free to leave, that his participation in the

interview was voluntary, and that he could terminate the interview or decline to answer particular

questions at any time.  *Id.* at 1:36–4:13.  Agent Frohnapfel proceeded to give Blythe high-level

background on the investigation and explained that the search warrant permitted them to collect

certain electronic devices in the home and to review their contents for child sexual abuse material.

*Id.* at 4:13–6:55.

After Agent Frohnapfel collected Blythe's biographical and contact information, the agents

asked Blythe a series of questions regarding his relationship with C.D.  *Id.* at 6:56–9:10.  Agent

Frohnapfel explained that they had "read basically every text message" that Blythe and C.D. had

exchanged over the past "five or six years," noting that the messages included attachments and

links.  *Id.* at 9:11–9:49.  Shortly after Agent Frohnapfel asked Blythe to provide background on

the nature of those attachments and links, Blythe stated that he wanted to speak with an attorney. *Id.* at 9:50–10:45.  Agent Frohnapfel and Agent Lee terminated the interview.  *Id.* at 10:46–11:40.

Agent Frohnapfel told Blythe that it would take FBI agents approximately one and a half to two hours to finish searching the home.  *Id.* at 11:00–11:12.  He also told Blythe that he was free to leave the premises while the search continued.  Tr. of Evidentiary Hr'g 39:4–22.  He further explained that, if Blythe chose instead to stay in the home, he must remain within one room.  *Id.*[2] Blythe chose to stay in the home.  *Id.* at 39:23–24.

Blythe was escorted back to the sitting room on the main level of the home, where he took a seat on a couch that agents had cleared.  *Id.* at 39:25–41:6, 135:13–22.  He was not re-handcuffed. *Id.* at 41:16–18.  After Blythe returned inside, Agent Griffith entered the sitting room with an iPhone that she had located on the floor in a main-level bedroom in the back right of the home— the same area of the home from which Blythe had appeared when agents broke open the front door. *Id.* at 42:14–43:9, 73:9–74:15, 90:4–16, 108:21–110:1, 136:18–137:1; *see* Gov't Ex. 7; Gov't Ex. 8.  The iPhone was powered on and in the after-first-unlock state, meaning that, although the phone was locked, the passcode had been entered at least one time since the phone was powered on.  Tr. of Evidentiary Hr'g 111:4–6, 119:17–120:1, 122:6–125:10.  A phone in after-first-unlock state can be opened using a passcode or physical biometric characteristics.  *Id.* at 122:11–124:23.

Agent Griffith approached Blythe and told him that the search warrant authorized her to hold the phone up to his face to obtain his facial biometrics.  *Id.* at 43:10–21, 74:1–75:3, 109:19– 111:3, 136:18–137:6.  When she proceeded to do so, however, Blythe closed his eyes and turned his head away, saying something to the effect of "I don't want to do this."  *Id.* at 43:10–21, 74:1–

---

[2] Agent Frohnapfel testified that Blythe would need to remain in a single room during the execution of the search warrant so that the FBI could ensure officer safety and maintain the security of the scene.  Tr. of Evidentiary Hr'g 39:13–22.

75:22, 111:7–12, 136:25–137:14.  Agent Griffith and Agent Frohnapfel again explained that the warrant permitted them to compel the display of Blythe's physical biometric characteristics.  *Id.* at 43:10–44:7, 111:17–24.  Because Agent Frohnapfel did not have a physical copy of the warrant with him, he attempted to open a copy on his phone.  *Id.* at 43:22–44:7, 75:23–76:9.  He read Blythe paragraph 49 of the affidavit in support of the warrant, which authorized agents to compel the display of physical biometric characteristics; he did not read the portion of the warrant or of the affidavit that prohibited agents from (1) ordering Blythe to unlock a device; or (2) asking Blythe for information regarding how to unlock a device, or stating or implying that the warrant required him to provide such information.  *Id.* at 44:1–7, 75:23–77:3.  Agent Griffith again held the phone to Blythe's face; Blythe again indicated that he did not want to comply.  *Id.* at 44:20–45:2, 111:25–112:9.  When face ID again failed, Blythe entered a passcode, saying "it's just easier this way."  *Id.* at 44:20–45:2, 54:2–7, 112:2–9, 141:10–142:3.  Agents did not ask Blythe whether or which physical biometric characteristics could open the phone.  *Id.* at 44:10–19, 110:16–111:1.  They also neither asked Blythe to unlock the device using the passcode nor advised him that the warrant did not authorize them to compel him to do so.  *Id.* at 44:8–9, 83:7–18, 110:23–24.  Agent Griffith saw some, but not all, of the digits that Blythe entered to unlock the phone.  *Id.* at 112:17–25.  Agent Frohnapfel was not able to see any digits.  *Id.* at 45:7–9. The phone's passcode prompt screen indicated that the passcode to the phone was six digits.  *Id.* at 52:11–14, 110:4–10.

Agent Griffith took the unlocked iPhone to a different room to begin an on-scene preview that would allow the FBI to determine to whom the phone belonged and to perform a preliminary review of the phone's contents.  *Id.* at 46:3–15, 85:1–87:3, 113:1–17.

While FBI agents reviewed the contents of the iPhone, Agent Frohnapfel located on the dining room table a laptop that, based on the user profile, appeared to be associated with Blythe.

*Id.* at 46:16–47:4.  Agent Frohnapfel brought the laptop to Blythe and explained that he was going to unlock the laptop using face ID.  *Id.* at 47:2–8.  When attempts to unlock the laptop using face ID failed, the login screen prompted entry of a password.  *Id.* at 47:6–11.  Agent Frohnapfel spent some time trying to back out of the password screen to return to face ID but was unable to do so. *Id.* at 47:9–13.  At that point, Agent Frohnapfel handed Blythe the laptop and said, "we can try this"—as in the password—"we can try the facial thing," adding "that's up to you."  Gov't Ex. 5, at 0:00–0:05; *see* Tr. of Evidentiary Hr'g 47:13–18, 49:1–7.  Blythe took the computer, entered a four-character password, and handed back the unlocked laptop.  Gov't Ex. 5, at 0:05–0:15; *see* Tr. of Evidentiary Hr'g 54:8–10.  Fairfax County Detective Blake Allbritton recorded on his cellphone a video of Blythe entering the password into the computer.  *See* Tr. of Evidentiary Hr'g 168:14–169:14; *see* Gov't Ex. 5, at 0:05–0:15.

As Agent Frohnapfel left with the laptop, Agent Griffith returned with the iPhone, which had locked while law enforcement was conducting the on-scene preview.  Gov't Ex. 5, at 0:15–0:20; Tr. of Evidentiary Hr'g 84:14–25, 114:2–7.  Agent Griffith approached Blythe, saying, "sorry, I just need your face again on your phone."  Gov't Ex. 5, at 0:15–0:20; Tr. of Evidentiary Hr'g 49:20–25, 114:2–15.  Detective Allbritton added, "or you can do password—whatever's easier for you."  Gov't Ex. 5, at 0:20–0:22; Tr. of Evidentiary Hr'g 50:1–14, 114:13–22.  Blythe took the cellphone from Agent Griffith and entered the passcode, then handed the unlocked device back to her.  Gov't Ex. 5, at 0:22–0:30.  Agents did not advise Blythe that the search warrant did not authorize law enforcement to compel him to enter the passcode.  Tr. of Evidentiary Hr'g 147:12–16.  Detective Allbritton also recorded this interaction on video.  *Id.* at 168:14–23.  The video recording captures Blythe entering a passcode into the phone.  Gov't Ex. 5, at 0:22–0:30.

Agents ultimately learned that the iPhone passcode was 082864 and that the laptop password was 0828—both abbreviated versions of Blythe's birth date.  Tr. of Evidentiary Hr'g 54:2–12.

Agents petitioned for an arrest warrant based on the materials discovered on the iPhone during the on-scene preview, including messages between Blythe and C.D. and images stored on the phone.  *Id.* at 87:4–90:3, 146:24–147:11, 154:22–155:1.  Blythe was arrested on scene.  *Id.* at 90:2–3.  Agent Frohnapfel testified that he did not know the extent of the on-scene preview conducted after Blythe first unlocked the phone.  *Id.* at 89:5–23.  His review of the messages and images, however, took place after Blythe unlocked the phone a second time.  *Id.*  Agent Griffith testified that she did not know what content was observed after the first unlock.  *Id.* at 113:1–10.

After Blythe was arrested, Agent Griffith took the iPhone to an FBI facility and connected it to Graykey, a device capable of extracting data from cellphones.  *Id.* at 121:23–122:11, 125:19–21.  Graykey extracts data from locked cellphones using various methods.  For some cellphones, Graykey is able to guess the phone passcode using a passcode database; for others, Graykey is able to bypass the passcode completely.  *Id.* at 118:10–14, 151:25–152:12.  Graykey is not always successful—whether it is able to extract data from a cellphone depends on such variables as the state the phone is in (*e.g.*, locked or unlocked; before-first-unlock or after-first-unlock), the model of phone, and the phone's operating system.  *Id.* at 149:23–153:25.  Graykey also cannot extract certain information from a locked phone, including some types of GPS and health data.  *Id.* at 164:2–165:6.  When Graykey extracts data from a cellphone, it provides the extracted data in raw form.  *Id.* at 117:19–22.  Other software must be used to view and analyze the data.  *Id.* at 117:23–118:4.

Because Agent Griffith had the passcode to the seized iPhone, she used the passcode to unlock the phone and performed a full data extraction on the unlocked phone using Graykey.  *Id.* at 122:6–125:21, 156:14–18.

On October 2, 2025, Agent Griffith checked the iPhone out of evidence to determine what data Graykey would have extracted from the phone during the first extraction had she not unlocked the phone using the passcode.  *Id.* at 119:7–126:5, 163:5–12.  Because the phone had died while in evidence, Agent Griffith plugged it in and allowed it to charge.  *Id.* at 119:10–13.  Once charged, the phone was in before-first-unlock state, meaning that the passcode had not been entered since the phone had powered on.  *Id.* at 119:10–121:8.  On October 3, 2025, Agent Griffith replicated the after-first-unlock state in which the FBI first found the phone in August by entering the passcode and then locking the phone.  *Id.* at 119:10–126:5, 159:2–4.  She then connected the phone to Graykey and performed a data extraction.  *Id.* at 126:6–16.

The data that Graykey extracted from the iPhone during the October extraction mirrored in material respects the initial extraction the FBI performed upon seizing the phone.  *Id.* at 126:1–127:4, 154:18–155:1, 159:8–10.  Although Agent Griffith did not conduct a file-by-file comparison of the extractions, she confirmed that both extractions contained the files and messages identified in the complaint, as well as other child sexual abuse material.  *Id.* at 155:9–17, 159:8–18, 163:23–166:3.  Agent Griffith testified that, based on her training and experience, the first data extraction did not impact the second—the extraction profiles would have been the same no matter the order in which they were performed.  *Id.* at 155:18–157:14.

Agent Griffith further testified that it is the FBI's standard practice to transport all seized cellphones back to an FBI office and to connect them to an extraction device like Graykey.  *Id.* at 127:5–9.  It is only in rare circumstances that the FBI does not follow that standard practice, such

as when the phone is a work phone or belongs to another individual. *Id.* at 53:10–15, 116:16–117:11, 127:5–15. If a cellphone is in the after-first-unlock state and FBI agents do not have the phone's passcode, agents will keep the phone charged while transporting the device to an FBI office, as it is easier for Graykey to extract data from a cellphone in that state. *Id.* at 161:13–162:3.

The FBI's search of the iPhone and of a Samsung storage device also seized during the search of Blythe's home remains ongoing. *Id.* 94:2–9. Although the FBI seized a second cellphone during the search, the phone was in factory reset mode and did not contain any data. *Id.* at 127:22–25.

## II.    LEGAL STANDARDS

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. While the amendment "contains no provision expressly precluding the use of evidence obtained in violation of its commands," *Arizona v. Evans*, 514 U.S. 1, 10 (1995), the Supreme Court has "establish[ed] an exclusionary rule that, when applicable, forbids the use of improperly obtained evidence at trial," *Herring v. United States*, 555 U.S. 135, 139 (2009). When this rule applies, it "prohibits the government from introducing in its case in chief evidence obtained in violation of the Fourth Amendment." *United States v. Weaver*, 808 F.3d 26, 33 (D.C. Cir. 2015).

The Fifth Amendment provides that "[n]o person shall be . . . compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. "To qualify for the Fifth Amendment privilege, a communication must be testimonial, incriminating, and compelled." *Hiibel v. Sixth Jud. Dist. Ct. of Nevada, Humboldt County*, 542 U.S. 177, 189 (2004). Furthermore, to protect the right against compelled self-incrimination, the Supreme Court has held that the government may not introduce at trial statements made by a defendant during custodial interrogation unless the

government "demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).  When an individual "in custody is subjected to interrogation," *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980), those procedural safeguards typically take the form of *Miranda* warnings, which include warning the individual "prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires," *Miranda*, 384 U.S. at 479.  For these purposes, "the term 'interrogation' . . . refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response."  *Innis*, 446 U.S. at 301.

## III.    ANALYSIS

Blythe moves to suppress the evidence discovered on the seized iPhone under both the Fourth and Fifth Amendments to the Constitution.  His primary argument is that the search warrant, which purported to authorize law enforcement agents to compel him to display his physical biometric characteristics, violated his Fifth Amendment right against compelled self-incrimination and was facially unconstitutional.  *See* Mot. to Suppress 4–6, Dkt. 22.  Alternatively, he argues that, even if the warrant was constitutional on its face, law enforcement violated the Fourth Amendment because they did not comply with the terms of the warrant.  *See id.* at 6–9.  Finally, Blythe argues that law enforcement violated his Fifth Amendment rights by questioning him after he invoked his right to counsel.  *See* Reply in Support of Mot. to Suppress 1–5, Dkt. 27.

For the reasons that follow, the Court concludes that the search warrant was not unconstitutional on its face.  The Court further concludes that, even if law enforcement violated

the terms of the warrant or Blythe's Fifth Amendment right against self-incrimination, the government has established by a preponderance of the evidence that it would have been able to gain access to evidence on the cellphone using lawful methods.  Accordingly, the evidence discovered on the seized iPhone is admissible under the inevitable discovery doctrine.

### A.     The Search Warrant Was Not Unconstitutional On Its Face

Blythe's Fifth Amendment argument relies principally on the D.C. Circuit's recent decision in *United States v. Brown*, 125 F.4th 1186 (D.C. 2025).  *See* Mot. to Suppress 4–6.  In his telling, *Brown* makes clear that "[t]he use of facial recognition or fingerprints to open an electronic device is 'testimonial'" and that "the compulsion of such actions is a violation of the Fifth Amendment." *Id.* at 4; *see id.* ("In *Brown*, the Circuit was clear that commands to unlock a phone via the use of a thumbprint was a 'compelled opening' that violates the Fifth Amendment.").  The Court disagrees.

### 1.     *The D.C. Circuit's Analysis In* Brown

*Brown* involved the seizure and compelled opening of an electronic device.  While executing a search warrant at the appellant's residence, law enforcement found and ordered the appellant—Peter Schwartz—to open a locked cellphone.  *Brown*, 125 F.4th at 1200–02.  "Schwartz complied by placing his thumb on the cellphone."  *Id.* at 1202.  He later moved to suppress evidence obtained from subsequent searches of the device.  *See id.* at 1200, 1204–05.

The D.C. Circuit held that the manner in which law enforcement compelled Schwartz to unlock the cellphone violated his Fifth Amendment right against self-incrimination.  *See id.* at 1201.  The government had conceded that "Schwartz's opening of the cellphone with his thumbprint was involuntary," *id.* at 1200, and that the compelled opening "was incriminating as it identified Schwartz as the likely owner of, and a person with access to and control over, the phone

and its inculpatory messages," *id.* at 1201. As such, the D.C. Circuit was left to assess only the first prong of Schwartz's Fifth Amendment claim: "whether disclosing to police Schwartz's way of opening the cellphone and his ability to do so was testimonial." *Id.* The court concluded that, "under both the physical-trait and act-of-production caselaw, Schwartz's compelled unlocking of the phone was testimonial." *Id.* at 1204; *see id.* at 1202 ("Th[e] compelled biometric unlock of a cellphone arises at the intersection of the Fifth Amendment's physical-trait and act-of-production precedents.").

Starting with the physical-trait caselaw, the D.C. Circuit explained that, although law enforcement's use of an individual's physical traits is generally not considered testimonial, "the inquiry is contextual." *Id.* at 1202. The court noted that the Fifth Amendment does not, for example, "protect against the involuntary furnishing of a blood sample, submitting to fingerprinting, providing a handwriting exemplar, providing a voice exemplar, standing in a police lineup, or donning particular clothing," none of which requires an individual to "disclose any knowledge he might have" or to "speak his guilt." *Id.* (citation modified). At the same time, however, the court recognized that certain displays of physical traits—such as "physiological changes observed during a lie detector test"—can be testimonial, as they are tangible "manifestations" of the testimonial knowledge and thoughts in an individual's mind. *Id.*

The court reasoned that, "[t]hough placing a thumb on a phone may seem akin to submitting to fingerprinting or providing a handwriting exemplar," Schwartz's compelled unlocking was "much closer to responding to a lie detector test or complying with a command to say a password." *Id.* "When Schwartz was ordered to open the cellphone," the court explained, "his act of unlocking the phone represented the thoughts 'I know how to open the phone,' 'I have control over and access to this phone,' and 'the print of this specific finger is the password to this phone.'" *Id.* The court

reasoned that, had Schwartz "instead been compelled to disclose whether he could open the phone, and made to say yes or to verbally disclose the password, those answers unquestionably would be testimonial communications." *Id.* at 1202–03. Because Schwartz's compelled opening of the cellphone conveyed the same information, the court concluded that it was a testimonial act. *See id.* at 1203; *see also id.* ("[T]he compelled opening of a cellphone itself directly announces the owner's access to and control over the phone, as well as his mental knowledge of how to unlock the device.").

The D.C. Circuit further found that "[t]he act-of-production line of cases confirm[ed] that compelling Schwartz to open the phone was testimonial." *Id.* Although typically applied in cases involving responses to document subpoenas, that doctrine "recognizes that physical acts can be communicative wholly aside from the contents of anything produced when the action implies assertions of fact." *Id.* (citation modified). Applying the doctrine in *Brown*, the court concluded that Schwartz's compelled opening of the cellphone communicated testimonial messages. *Id.* at 1203–04. As the court reasoned, when Schwartz complied with law enforcement's command to unlock the phone, "that act disclosed his control over the phone, his knowledge of how to access it, and the existence, authenticity, and ownership of documents within it." *Id.* at 1204; *see id.* at 1203–04 ("Because the FBI directed Schwartz to open the phone, the government compelled Schwartz to disclose his knowledge of how the phone could be opened, and specifically his understanding that his thumb would unlock the device, and those disclosures revealed his ownership or control over the phone and the messages it contained."). The act of unlocking the phone, the court concluded, "was tantamount to answering a series of questions about ownership or control over the phone, including how it could be opened and by whom" and was thus testimonial under the Fifth Amendment. *Id.* at 1204.

In reaching this holding, the D.C. Circuit distinguished the Ninth Circuit's decision in *United States v. Payne*, 99 F.4th 495 (9th Cir. 2024). In *Payne*, law enforcement "forcibly grabbed [the appellant's] thumb and used it to unlock" a cellphone. *Id.* at 500. Applying the Supreme Court's physical-trait and act-of-production caselaw, the Ninth Circuit held that the act was not testimonial. *See id.* at 508–13. Like a blood draw or fingerprinting at booking, the court reasoned, using an individual's thumb to unlock a phone "do[es] not involve the testimonial capacities of the accused and instead only compel[s] an individual to provide law enforcement with access to an immutable physical characteristic." *Id.* at 509. The court further concluded that the physical act of unlocking the phone did not implicitly communicate testimonial information, as the act neither required "cognitive exertion," *id.* at 512, nor "divulge[d] the contents of [the appellant's] mind," *id.* at 511; *see id.* at 509–13. The "level of existence, control, and authentication established through a biometric unlock," *id.* at 511, the court found, was either absent or, at a minimum, "significantly less compelling," *id.* at 513, than in those act-of-production cases in which a response to a document subpoena "implicitly conced[es] the existence, authenticity, and custody of specific documents that prosecutors could use in building its case against the respondent," *id.* at 511–12 (citation modified).

The Ninth Circuit emphasized, however, that its reasoning in *Payne* "should not be read to extend to *all* instances where a biometric is used to unlock an electronic device." *Id.* at 513. The court noted, for instance, that "the outcome on the testimonial prong may have been different had [law enforcement] required [the appellant] to independently select the finger that he placed on the phone." *Id.* Such a command, the Ninth Circuit suggested, may have required the appellant to "engage in some thought process" that could, in turn, be conveyed via the physical act of unlocking the device. *Id.*

Noting that the facts before it presented the very scenario that the Ninth Circuit acknowledged might lead to a different result, the D.C. Circuit concluded that its holding in *Brown* was "consistent with the Ninth Circuit's decision in *Payne*." *Brown*, 125 F.4th at 1204 n.2.

2.    *The Search Warrant In This Case*

The search warrant in this case was not unconstitutional on its face under the analysis set forth in *Brown*. The warrant authorized law enforcement to compel the display of Blythe's physical biometric characteristics, while prohibiting agents from (1) ordering him to unlock a device; or (2) asking him for information regarding how to unlock a device, or stating or implying that the warrant required him to provide such information. *See* Warrant 10–11. Neither the permissive nor the restrictive aspect of those compelled-unlock parameters ran afoul of *Brown*.

Start with the permissive aspect. In *Brown*, the D.C. Circuit concluded that its holding was "consistent" with the Ninth Circuit's determination that the compelled unlocking of a cellphone is not testimonial where law enforcement compels an individual to produce only a physical biometric characteristic, such as the individual's face or fingerprint. *Brown*, 125 F.4th at 1204 n.2; *see Payne*, 99 F.4th at 508–13. The permissive aspect of the warrant's compelled-unlock parameters allowed for that very type of compelled display. *See* Warrant 9 ("Law enforcement are authorized to attempt to unlock any such Device(s)'s security features in order to search the contents as authorized by this warrant by compelling the display of such a physical biometric characteristic; that is, (1) by pressing or swiping the fingers or thumbs of [Blythe] against the fingerprint scanner of any such Device(s) and/or (2) by holding in front of the face of [Blythe] to activate the facial recognition or iris recognition feature of any such Device(s).").

The restrictive aspect, for its part, tracked precisely the activity held unlawful in *Brown*. The D.C. Circuit held in *Brown* that Schwartz's compelled unlocking of the cellphone was

testimonial because, in ordering Schwartz to unlock the phone, law enforcement compelled Schwartz to disclose how to unlock the phone and his ability to do so. *See Brown*, 125 F.4th at 1202–04. By prohibiting law enforcement from, among other things, ordering Blythe to unlock or provide information regarding how to unlock a device, the warrant in this case specifically prohibited law enforcement from compelling such a testimonial response.

Blythe resists this conclusion, arguing that the search warrant contravened *Brown* because compelling the display an individual's physical biometric characteristics discloses the individual's "knowledge of and relationship to" a seized cellphone. Mot. to Suppress 5. But while the fact that an individual's face or finger unlocks a cellphone may reveal that the individual has control over or ownership of the phone, that information is not sufficient to make the compelled display of such characteristics testimonial under *Brown*. The compelled unlocking in *Brown* conveyed not only Schwartz's control over the phone, but also "his knowledge of how to access it." *Brown*, 125 F.4th at 1204; *see id.* at 1202 ("When Schwartz was ordered to open the cellphone, his act of unlocking the phone represented the thoughts 'I know how to open the phone,' 'I have control over and access to this phone,' and 'the print of this specific finger is the password to this phone.'"); *id.* at 1203 ("[T]he compelled opening of a cellphone itself directly announces the owner's access to and control over the phone, *as well as his mental knowledge of how to unlock the device*." (emphasis added)). A compelled display of a physical biometric characteristic, in contrast, does not convey an individual's "mental knowledge of how to unlock [a] device." *Id.* at 1203. Furthermore, *Brown* does not stand for the proposition that the compelled display of a physical biometric characteristic to unlock a device is testimonial. Indeed, the D.C. Circuit took care to note that its holding was

consistent with the Ninth Circuit's determination that it is not.  *See id.* at 1204 n.2.  The Court will

not expand *Brown*'s reasoning to encompass an act that the D.C. Circuit specifically carved out.[3]

**B.  Even If Law Enforcement Exceeded The Restrictions In The Search Warrant, The Evidence Discovered On The Seized iPhone Is Admissible Under The Inevitable Discovery Doctrine**

Blythe alternatively argues that, even if the search warrant was constitutional on its face,

law enforcement did not lawfully execute it.  *See* Mot. to Suppress 6–9.  While the Court finds the

question whether law enforcement complied with the warrant to be close, it ultimately need not

decide the issue.  Even if law enforcement violated the terms of the warrant, the government has

established by a preponderance of the evidence that it would have been able to gain access to the

relevant evidence using lawful methods.

**1.  *Law Enforcement's Compliance With The Search Warrant***

**i.  The Warrant's Terms**

As an initial matter, Blythe's argument relies, in part, on a misreading of the search warrant.

Blythe argues that law enforcement failed to comply with the terms of the warrant that "explicitly

directed law enforcement not to 'state or otherwise imply that the warrant requires the person to

provide such [biometric or password] information' and affirmatively required that law

enforcement 'will make clear that providing any such [biometric or password] information is

---

[3] In passing, Blythe argues that "[t]he warrant was additionally unconstitutional to the extent it compelled [him] to provide biometric password information based on law enforcement's determination that there was 'reasonable suspicion that [his] physical biometric characteristics [would] unlock the device,'" rather than probable cause.  Mot. to Suppress 6 (fourth alteration in original) (quoting Warrant 9).  The Court will reject this challenge.  In the context of a search warrant that is itself based on probable cause, compelling the display of physical biometric characteristics is the kind of non-intrusive, external search subject only to reasonable suspicion. *See In re Search of [Redacted], Washington, D.C.*, 317 F. Supp. 3d 523, 531–33 (D.D.C. 2018).

voluntary and that the person is free to refuse the request.'"    *Id.* at 6 (alterations in original)

(quoting Warrant 10).

Considering Blythe's quoted language in context makes clear that his substituted language

is in error.  The relevant text of the search warrant reads, in full:

> While attempting to unlock the device by use of the compelled display of biometric characteristics pursuant to this warrant, law enforcement is not authorized to demand that the aforementioned person state or otherwise provide the password or identify the specific biometric characteristics (including the unique finger(s) or other physical features), that may be used to unlock or access the Device(s).  Nor does the warrant authorize law enforcement to use the fact that the warrant allows law enforcement to obtain the display of any biometric characteristics to compel the aforementioned person to *state or otherwise provide that information*.  However, the voluntary disclosure of such information by the aforementioned person is permitted.  Specifically, [if] agents in executing the warrant ask any of the aforementioned person[(s)] for the password to any Device(s), or to identify which biometric characteristic (including the unique finger or other physical features) unlocks any Device(s), the agents will not state or otherwise imply that the warrant requires the person to provide such information, and *will make clear that providing any such information is voluntary and that the person is free to refuse the request*.

Warrant 9–10 (emphases added).  "Such information" does not, as Blythe suggests, refer generally

to all biometric and password information.  Rather, the phrase refers to "the password" and "the

specific biometric characteristics (including the unique finger(s) or other physical features), that

may be used to unlock or access the Device(s)."  *Id.* at 9.  Put differently, the warrant prohibited

law enforcement from compelling Blythe to provide the password for a device or to identify the

biometric characteristic(s) that would open a device; if law enforcement did ask Blythe for *any*

*such information*, the warrant required them to make clear that he was free to decline to answer.

This reading is bolstered by the permissive aspect of the warrant's compelled-unlock

parameters, which specifically permitted law enforcement to compel Blythe to display certain

physical biometric characteristics.  *See id.*  Blythe's proposed reading would impose an internal

contradiction on the warrant under which law enforcement could compel the display of certain

physical biometric characteristics but could not state or imply that the warrant allowed them to do so.  The text of the warrant neither suggests nor requires such a reading.

ii.      The First And Second Unlockings Of The iPhone

Even still, the Court finds that the question whether law enforcement complied with the terms of the search warrant to be a difficult one, at least as to the second unlocking of the seized iPhone.

a.   The First Unlocking

Law enforcement lawfully executed the search warrant as to the first unlocking of the iPhone.  Leading up to that first unlocking, Agent Griffith and Agent Frohnapfel attempted to unlock the phone using Blythe's facial biometrics, twice explaining that the warrant authorized them to do so.  Tr. of Evidentiary Hr'g 43:10–44:7, 74:1–77:3, 109:19–111:24, 136:18–137:6. After Blythe declined to comply with Agent Griffith's second attempt to unlock the phone using his facial biometrics, he entered the passcode.  *Id.* at 44:20–45:2, 54:2–7, 112:2–9, 141:10–142:3.

The agents' actions in this exchange did not violate the search warrant's express terms. Agent Griffith and Agent Frohnapfel did not demand that Blythe provide the iPhone's passcode or identify the biometric characteristics that would open the phone.  Nor did they imply that the warrant authorized them to compel Blythe to disclose that information.  The agents simply attempted to compel the display of Blythe's facial biometrics, an act clearly authorized by the warrant's terms.  *Contra* Mot. to Suppress 8 ("By repeatedly placing the phone to Mr. Blythe's face, agents communicated a demand that he unlock it."); *id.* at 9 ("Through a show of authority that contravened the express limitations on their authority articulated in the warrant, law enforcement made clear that Mr. Blythe had no choice but to unlock the phone.").

Nonetheless, Blythe contends that Agent Griffith and Agent Frohnapfel had an affirmative obligation to "make clear to [Blythe] that providing password information had to be voluntary." *Id.* at 9. That argument is misplaced. While the terms of the warrant required the agents to give such a warning if they asked Blythe to provide any password information, *see* Warrant 10 (requiring agents to "make clear that providing any such information is voluntary and that the person *is free to refuse the request*" (emphasis added)), the agents never made such a request. The warrant did not impose on the agents a general obligation to ensure that Blythe knew that he could refuse to enter a password into any device.

As to the first unlocking, Agent Griffith and Agent Frohnapfel's attempts to compel Blythe to display his facial biometrics did not amount to an attempt to "compel [Blythe] to state or otherwise provide" any password information in violation of the warrant's terms. *Id.*

a.   The Second Unlocking

The circumstances surrounding the second unlocking, however, present a closer question. When Agent Griffith returned with the locked iPhone and told Blythe that she "need[ed] [his] face again on [the] phone," Detective Allbritton added, "or you can do password—whatever's easier for you." Gov't Ex. 5 0:20–0:22; *see* Tr. of Evidentiary Hr'g 49:20–50:14, 84:14–25, 114:2–15. Although Detective Allbritton did not directly ask for the iPhone's passcode or demand that Blythe open the phone using the passcode, his words in context could be understood as such. A person in Blythe's position, that is, might have reasonably understood Agent Griffith and Detective Allbritton's statements to mean, "you can either allow us to use your facial biometrics or you can enter the passcode, but you must do one or the other," not, "you must allow us to use your facial biometrics but you may instead choose to enter the passcode if you prefer." Although the distinction is slight, Blythe raises at least a plausible argument that the agents' statements

amounted to a request that Blythe enter the phone's passcode, unaccompanied by a clarification that he was free to refuse the request.

### 2.    *Inevitable Discovery*

The Court need not, however, resolve whether law enforcement's actions surrounding the second unlocking complied with the terms of the search warrant. Even assuming a constitutional violation occurred, the Court concludes that law enforcement would have inevitably succeeded in extracting the relevant data from the seized iPhone using lawful means.[4]

"[T]he inevitable discovery doctrine allows for the admission of evidence that would have been discovered even without the unconstitutional source." *Utah v. Strieff*, 579 U.S. 232, 238 (2016); *see Nix v. Williams*, 467 U.S. 431, 448 (1984) ("[W]hen . . . the evidence in question would inevitably have been discovered without reference to the police error or misconduct, there is no nexus sufficient to provide a taint and the evidence is admissible."). "[I]nevitable discovery involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment." *Nix*, 446 U.S. at 444 n.5. "To prevail on an inevitable discovery theory, the government must prove by a preponderance of the evidence that, even without the unlawful [search], the evidence it seeks to admit would have been discovered" by lawful means. *United States v. Holmes*, 505 F.3d 1288, 1293 (D.C. Cir. 2007); *Nix*, 467 U.S. at 444 n.5.

---

[4] This analysis applies whether Blythe's argument is framed in Fourth Amendment terms (*i.e.*, law enforcement exceeded the scope of the warrant) or Fifth Amendment terms (*i.e.*, Blythe did not enter the passcode voluntarily). *See Brown*, 125 F.4th at 1205 (inevitable discovery doctrine applies to both Fourth and Fifth Amendment violations); *see also, e.g.*, Reply in Support of Mot. to Suppress 8 ("Each time Mr. Blythe unlocked a device, he did so under duress because agents made him feel as though he could not refuse and had no choice given the judicial warrant. Even if he simply acquiesced with the agents' commands, his acquiescence was not free from coercion and his act of production conveyed incriminating information.").

Here, the government has met its burden of proving by a preponderance of the evidence that law enforcement would have been able to extract the relevant data from the seized iPhone without the passcode Blythe provided. Agent Griffith testified that, had the FBI not obtained the passcode, the FBI's standard practice would be to keep the device charged—and thus in the after-first-unlock state in which it was seized—and transport it to an FBI office to connect it to an extraction device like Graykey. Tr. of Evidentiary Hr'g 53:10–15, 116:16–117:11, 127:5–15, 161:13–162:3. No "speculative elements" are necessary to conclude that the resulting extraction would have been successful. *Nix*, 446 U.S. at 444 n.5. When Agent Griffith put the seized iPhone into after-first-unlock state and connected it to Graykey in October 2025, the content of the extraction mirrored in material respects that of the initial extraction, including with respect to the messages and child sexual abuse material identified in the complaint. Tr. of Evidentiary Hr'g 126:1–127:4, 154:18–155:17, 159:8–10, 163:23–166:3. *Contrast, e.g.*, *United States v. Raymond*, No. 21-cr-380, 2023 WL 7005341, at *12 (D.D.C. Oct. 24, 2023) ("The evidentiary record establishes that it is indeed wholly speculative that [Computer Investigation and Forensics] would have ever gained access to either phone's contents, and even then precisely what would have been forensically imageable.").[5]

---

[5] At the evidentiary hearing, Agent Griffith testified that Graykey would have been equally successful on any iPhone of the same model and running the same operating system as the seized iPhone. *See* Tr. of Evidentiary Hr'g 156:5–158:22. She further testified that there is a matrix that indicates whether or not Graykey will be able to extract data from a given device. *See id.* at 151:6–15. This testimony provides further support for the government's inevitable discovery argument. But because Agent Griffith did not testify that she consulted that matrix or any source beyond the October 2025 extraction to determine whether Graykey would have been successful based on the phone, *see also id.* at 158:23–159:4 ("Q: And so when you conducted this, you know, the most recent extraction, you didn't know if Graykey was going to be able to do it? A: I was not sure until I plugged it into the Graykey."), the Court does not rely on Agent Griffith's matrix testimony in its inevitable discovery analysis.

Blythe argues that the Court cannot rely on the October 2025 extraction to conclude that law enforcement would have been able to extract data from the iPhone without the passcode. In particular, he contends that the search warrant did not authorize law enforcement (1) to "continuously search" the cellphone outside of the warrant's "explicitly delineated 14-day period," Def.'s First Notice of Additional Authority 2, Dkt. 29; or (2) to search the cellphone for the purpose of performing an experiment to bolster the government's inevitable discovery argument, Def.'s Resp. to Order of the Ct. Regarding Additional Briefing 2–3, Dkt. 35. Neither argument succeeds.[6]

As the defense conceded at the November 13 motion hearing, Blythe's first argument fails under the clear text of Federal Rule of Criminal Procedure 41. That rule provides, in relevant part:

> A warrant under Rule 41(e)(2)(A) may authorize the seizure of electronic storage media or the seizure or copying of electronically stored information. Unless otherwise specified, the warrant authorizes a later review of the media or information consistent with the warrant. *The time for executing the warrant in Rule 41(e)(2)(A) and (f)(1)(A) refers to the seizure or on-site copying of the media or information, and not to any later off-site copying or review.*

Fed. R. Crim. P. 41(e)(2)(B) (emphasis added). Here, law enforcement seized the iPhone within the 14-day time period set forth in the warrant. The warrant did not place any limitations on the time in which law enforcement was required to search the device once seized. *Cf. United States*

---

[6] To the extent that Blythe also argues that the Court cannot consider the October 2025 extraction in its inevitable discovery analysis because Agent Griffith utilized the passcode to perform that extraction, *see* Reply in Support of Mot. to Suppress 10; Def.'s Second Notice of Additional Authority 1–2, Dkt. 38, his argument misconstrues the role the passcode played in that extraction. Agent Griffith used the passcode only to replicate the after-first-unlock state in which law enforcement initially seized and would have maintained the iPhone absent knowledge of its passcode. Tr. of Evidentiary Hr'g 119:10–126:5, 159:2–4. That Graykey was able to perform an extraction on the phone in that state establishes that law enforcement would have been able to extract the relevant data from the phone even without the passcode. Blythe himself acknowledges that the inevitable discovery doctrine is applicable if the government "can show that evidence would have been acquired lawfully through an independent source absent the government misconduct." Def.'s Second Notice of Additional Authority 2 (emphasis omitted). Here, the government makes such a showing by way of the October 2025 extraction.

*v. Gorrell*, 360 F. Supp. 2d 48, 55 n.5 (D.D.C. 2004) ("[T]he warrant only required that the search of the *defendant's home* occur on or before January 10, 2003.  The warrant did not limit the amount of time in which the government was required to complete its off-site forensic analysis of the seized items and the courts have not imposed such a prophylactic constraint on law enforcement.").

Blythe further argues that the October 2025 extraction was beyond the scope of the search warrant because it was "experimental" in nature and aimed at bolstering the government's inevitable discovery argument.  *See* Def.'s Resp. to Order of the Ct. Regarding Additional Briefing 3.  This argument, however, takes too narrow a view of the scope of the warrant and of the purpose of the October 2025 search.  The warrant "authorize[d] a review of electronic storage media and electronically stored information seized or copied pursuant to th[e] warrant in order to locate evidence, fruits, and instrumentalities described [therein]," including evidence of child sexual abuse material.  Warrant 10.  Blythe does not contest that the first extraction fell within the scope of this authorization.  Because Agent Griffith performed the October 2025 extraction in order to uncover the very same child sexual abuse material and related evidence found in the first extraction, it was no less "directed at uncovering the evidence specified in the search warrant" than was the first.  *United States v. Loera*, 923 F.3d 907, 917 (10th Cir. 2019); *see United States v. Castro*, 881 F.3d 961, 966 (6th Cir. 2018) ("Officers may conduct a more detailed search of an electronic device after it was properly seized so long as the later search does not exceed the probable cause articulated in the original warrant and the device remained secured.").  *Contrast, e.g.*, *Loera*, 923 F.3d at 916–21 (collecting cases in which law enforcement searched electronic data for evidence of crimes different from those identified in the search warrant).  The fact that the government could also use data from the October 2025 extraction to bolster its inevitable discovery argument does not bring the extraction outside of the warrant's scope.

Blythe counters that law enforcement cannot, without securing a new warrant, conduct a second extraction of an electronic device once an initial extraction is "deemed complete." Def.'s Resp. to Order of the Ct. Regarding Additional Briefing 4; *see id.* at 3–4.[7] That argument is unpersuasive. To start, it is not clear that a data extraction itself constitutes a Fourth Amendment search. *See* Orin S. Kerr, *Searches and Seizures in a Digital World*, 119 Harv. L. Rev. 531, 551 (2005) ("[A] search occurs when information from or about the data is exposed to possible human observation, such as when it appears on a screen, rather than when it is copied by the hard drive or processed by the computer."). If a "search" does not occur until law enforcement examines the contents of an extraction, the focus of the inquiry is not the purpose of the extraction, but the scope of the review of the extracted data. Here, there is no debate that Agent Griffith examined the data in the second extraction for evidence of the crimes identified in the warrant. *See* Tr. of Evidentiary Hr'g 126:1–127:4, 154:18–155:17, 159:8–10, 163:23–166:3.

In any event, the Court does not perceive a basis for the rigid line Blythe draws. Imagine that, after performing a full extraction of an electronic device, law enforcement realized that a subset of the extracted data had been inadvertently deleted, or learned after completing an extraction using Graykey that an updated version of the software could extract additional data. The Court is skeptical that, in either context, law enforcement would need to obtain a new search warrant to conduct a second extraction simply because the process of performing the first extraction was "complete." *Cf. United States v. White*, No. 25-5158, 2025 WL 2946149, at *4–5 (6th Cir. Oct. 17, 2025) (continued searches of electronic devices and digital copies thereof did

---

[7] As the search of the extracted data remains ongoing, *see* Tr. of Evidentiary Hr'g 94:2–9, the Court interprets Blythe's argument as centering on the fact that law enforcement had completed the process of extracting data from the seized iPhone, not on the extent of law enforcement's review of that data.

not violate Fourth Amendment where "the record show[ed] that several devices had encryption software that prevented the government from fully reviewing those devices in 2021, and with forensic technology upgrades the government was able to defeat the encryption software in 2023"). *Contra* Def.'s Resp. to Order of the Ct. Regarding Additional Briefing 3–4. The relevant analysis hinges not on whether a given extraction was second in time but on whether it was reasonably "directed at the evidence specified in the warrant." *Loera*, 923 F.3d at 919; *see id.* at 922 (subsequent search of seized CDs unreasonable because it was "directed at uncovering evidence" of crime outside the scope of warrant); *see also Castro*, 881 F.3d at 968 (distinguishing subsequent searches of electronic devices from subsequent searches of homes); *cf. Maryland v. Garrison*, 480 U.S. 79, 84 (1987) ("[T]he scope of a lawful search is defined by the object of the search and the places in which there is probable cause to believe that it may be found." (citation modified)). *Contrast, e.g.*, *United States v. Keszthelyi*, 308 F.3d 557, 568–73 (6th Cir. 2002) (holding subsequent search of residence unlawful because, among other reasons, "[o]nce the execution of a warrant is complete, . . . the authority conferred by the warrant terminates"). For the reasons already stated, the Court concludes that the October 2025 extraction was so directed. As such, the Court finds that the government has established by a preponderance of the evidence that, even without the iPhone passcode, law enforcement would have been able to gain access to the evidence discovered on the phone using Graykey.

### C. Even If Law Enforcement Violated Blythe's Fifth Amendment Rights By Questioning Him After He Invoked His Right To Counsel, The Evidence Discovered On The Seized iPhone Is Admissible Under The Inevitable Discovery Doctrine

Finally, Blythe argues that law enforcement violated his Fifth Amendment rights "by failing to cease all questioning after he invoked his right to counsel" during the voluntary interview, Def.'s First Notice of Additional Authority 1, and "instead t[aking] him into the house

and sa[ying] and d[oing] things to him in order to obtain from him passcode information for the seized devices," *id.* at 2.  Because law enforcement "'should have known' that their words and actions 'were reasonably likely to elicit an incriminating response,'" Blythe contends, they were unlawful.  *Id.* (quoting *Innis*, 446 U.S. at 301).  As such, he argues that "the fruits of [his] unlawfully compelled statements, including all passcode information and the evidence derived from the use thereof, must be suppressed."  *Id.* (citing *Miranda*, 384 U.S. at 444).

As to the evidence found on the seized iPhone, the same inevitable discovery analysis that applies to Blythe's Fourth Amendment scope-of-warrant argument resolves his Fifth Amendment invocation-of-counsel claim.  *See Brown*, 125 F.4th at 1205 (inevitable discovery doctrine encompasses both Fourth and Fifth Amendment violations).  Even if law enforcement violated Blythe's Fifth Amendment rights by continuing to question him after he invoked his right to counsel, suppression of the evidence found on the iPhone is not proper.  For the reasons stated, the government has met its burden of establishing that, even without the passcode, law enforcement would have gained access to the evidence using Graykey.

For the foregoing reasons, the defendant's Motion to Suppress, Dkt. 22, is **DENIED**.[8]

**SO ORDERED.**


Dabney L. Friedrich
DABNEY L. FRIEDRICH
United States District Judge

November 23, 2025

---

[8] This decision is without prejudice to any future motion to suppress evidence from the seized laptop.  The Court further defers ruling on Blythe's argument—raised for the first time in his reply in support of his motion to suppress—that any statements that he made prior to being read his *Miranda* rights must be suppressed.  *See* Reply in Support of Mot. to Suppress 1–5.  Finally, this decision resolves Blythe's arguments as to the suppression of "evidence discovered as a result of the search of a cell phone seized from his residence."  Mot. to Suppress 1.  It does not resolve any arguments regarding other evidence, including statements and password information.