**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| | )         **Case No. 1:25-CR-253 (DLF)** |
| | ) |
| | ) |
| **-v-** | ) |
| | ) |
| **VICTOR RENATO BLYTHE** | ) |
| | |
| **Defendant.** | |

### DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

Victor Blythe, by his attorney, Maria N. Jacob, Assistant Federal Public Defender, hereby submits the following memorandum in aid of sentencing in this matter.

Mr. Blythe is a 61-year-old man with no criminal history. As a result of his offense conduct, he has already suffered the worst possible collateral consequence, and that is almost dying as a result of being brutally beaten at the D.C. Jail. Because of his brain bleed and swelling that almost led to his death, Mr. Blythe will be at risk for post hemorrhage seizures for the rest of his life. Also as a result of his conduct, Mr. Blythe will never again work as a mental health professional, a career he worked hard to obtain and was passionate about for decades.

Notably, Mr. Blythe has already shown his remorse by participating in sex offender treatment while on temporary release in the past several months. Mr.

1

Blythe has benefitted from this treatment, which has allowed him to rehabilitate to ensure that this conduct never happens again.

Mr. Blythe acknowledges the seriousness of his offense conduct and has expressed remorse not only by engaging in treatment but also by writing a letter to the Court.

Given the remarkable 3553(a) factors present, he respectfully requests that the Court consider a sentence of 60 months' incarceration, which is the mandatory minimum required sentence.

## **BACKGROUND**

Mr. Blythe was arrested and charged with one Count of Distribution of Child Pornography and one Count of Possession of Child Pornography on August 12, 2025. ECF No. 1. He was ordered detained pending trial by the magistrate court on August 26, 2025. Mr. Blythe was indicted for the same charges on August 28, 2025. Mr. Blythe asked the district court to review his order of detention, which was affirmed on September 10, 2025.

While Mr. Blythe was detained at the D.C. Jail, he was attacked by another inmate on August 29, 2025. Unfortunately, due to lack of appropriate medical care at the jail, Mr. Blythe suffered a subdural hematoma and was eventually taken to Howard Hospital for emergency brain surgery on November 8, 2025. Given the lack of confidence that the Court had in the jail to provide appropriate care for Mr.

Blythe, he was granted temporary release pursuant to 18 U.S.C. § 3142(i) so that his medical needs could be adequately addressed.

In the meantime, Mr. Blythe, through his counsel, sought suppression of tangible evidence. After extensive briefing and an evidentiary hearing, this motion was denied. *See* ECF No. 41.

While on temporary release, Mr. Blythe was overall compliant with his conditions, minus one minor misunderstanding where he stopped at his house to get some personal belongings without the permission of his pre-trial officer. Other than that minor misstep, Mr. Blythe has complied with all conditions, has been attending counseling and sex offender treatment, and has self-surrendered to the D.C. Jail pending his stipulated trial and sentencing.

Given the court's continued concern regarding the D.C. Jail's ability to care for Mr. Blythe pending sentencing, the Court ordered an expedited schedule for both the stipulated bench trial and sentencing to occur on May 22, 2026. On that day, Mr. Blythe is prepared to agree to stipulated facts that will result in his conviction to the two-count indictment against him. He has reviewed the pre-sentence report and concurs with the calculated guideline range contained therein, however requests a downward variance from this range.

## ARGUMENT

### I.    Legal Standard

The Court is well aware of the Supreme Court's opinions in *Kimbrough v. United* States, 552 U.S. 84 (2007), and *Gall v. United States*, 552 U.S. 38 (2007). While

3

courts must continue to consider the sentencing guidelines, Congress has required federal courts to impose the least amount of imprisonment necessary to accomplish the purposes of sentencing as set forth in 18 U.S.C. §3553(a).[1]  As the Supreme Court made clear in *Kimbrough* and *Gall*, the Sentencing Guidelines are simply an advisory tool to be considered alongside other statutory considerations set forth in 18 U.S.C. §3553(a).

In two more summary reversals, the Court further clarified that the Guidelines cannot be used as a substitute for a sentencing court's independent determination of a just sentence based upon consideration of the statutory sentencing factors.  *Nelson v. United States*, 555 U.S. 350 (2009); *Spears v. United States*, 555 U.S. 261 (2009). "Our cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable," the Court held in *Nelson*, 555 U.S. at 352.  In other words, a sentencing court may not rely on the Sentencing Guidelines range as a default to be imposed unless a basis exists to impose a sentence inside that range.  Rather, the court must weigh each of the factors and impose a sentence that constitutes the least amount of imprisonment necessary pursuant to Section 3553(a).

**II.   Imposing a Sentence of 60 Months' Incarceration is Sufficient, But Not Greater Than Necessary, to Comply with 18.U.S.C. §3553(a).**

---

[1] Those factors include (a) the nature and circumstances of the offense and history and characteristics of the defendant; (b) the kinds of sentences available; (c) the advisory guideline range; (d) the need to avoid unwanted sentencing disparities; (e) the need for restitution; and (f) the need for the sentence to reflect the following: the seriousness of the offense, promotion of respect for the law and just punishment for the offense, provision of adequate deterrence, protection of the public from future crimes and providing the defendant with needed educational and vocational training, medical care, or other correctional treatment.  *See* 18 U.S.C. §3553(a).

### a. Mr. Blythe's Personal History and Characteristics

Mr. Blythe was born and raised in Washington, D.C. He and his siblings lived in the same family home in Northwest DC growing up. While Mr. Blythe's parents were successful, his father being a prominent surgeon and his mother a psychiatric social worker, his home life was far from perfect.

Mr. Blythe's father was unfaithful to their mother and they had a very toxic relationship where Mr. Blythe and his siblings observed them fight constantly. When Mr. Blythe was 14 years old, his parents separated as a result and his father left the home. Mr. Blythe was emotionally closer to his father as he often felt that his mother lacked affection towards him and his siblings.

Mr. Blythe grew up in the 70's and went to good schools in upper northwest. At this time, there was a stigma surrounding homosexuality. Mr. Blythe knew he was homosexual at the young age of 14, however was not able to tell anyone. As a young boy and adolescent, Mr. Blythe played competitive tennis to escape facing his sexual identity.

At the same time he was struggling to find his identity, Mr. Blythe was unfortunately the victim of sexual inappropriateness while a student in a Catholic school. One of the priests, who was also a teacher, touched Mr. Blythe inappropriately in secret. This was unfortunately not the only time that Mr. Blythe was violated by an adult. *See* PSR at par. 138-140. Some of these experiences were really ingrained into Mr. Blythe's psyche and he has never really dealt with them

until now. He never told his parents or anyone else because at that time, young adults and children did not realize that these inappropriate acts were in fact abuse.

Mr. Blythe went on to higher education and finally came out as a homosexual when he was a Freshman in college. He did not tell his mother until he was 28 years old. During college, Mr. Blythe excelled academically and he followed in his mother's footsteps to obtain a master's degree in social work from Howard University. Mr. Blythe went on to always hold stable and successful jobs, including at the National Institute of Health.

Mr. Blythe has only had one prior significant romantic relationship with a man who betrayed him in the most traumatic way possible. Not only was his significant other unfaithful to Mr. Blythe, but he also contracted HIV in the course of his infidelity. By some grace and luck, Mr. Blythe did not contract HIV. This broke the trust that Mr. Blythe had in people and devastated him beyond belief. As a result, he experienced significant depression and anxiety. Had this not happened, there is a good chance Mr. Blythe would have pursued marriage and a family.

Unfortunately, in the past several years, Mr. Blythe has sought companionship in all the wrong ways. He developed a serious pornography addiction and started using methamphetamine. The combination of these two things was a recipe for a continued decline in his mental health and behavior.

Prior to the instant offense, Mr. Blythe was residing with his brother in the same family home he grew up in. The family has since sold the home as a result of Mr. Blythe's arrest.

Over the years, however, he has developed many positive relationships with friends and family who speak very highly of him. His friend Kim Cauthen, who has known him for almost 30 years, describes Mr. Blythe as someone who has "consistently demonstrated love, kindness, and reliability." *See* Exhibit 1, Letter from Kim Cauthen. Molly Snyder has also known Mr. Blythe for three decades and says he has "demonstrated accountability for his actions and a sincere commitment to self-improvement." *See* Exhibit 2, Letter from Molly Snyder. Mr. Blythe has also shown remorse to his friend and colleague, Donald Burch, who expresses to the Court that his friend regrets what he did and has a strong love for his family that he admires greatly. *See* Exhibit 3, Letter from Donald Burch.

### b.  Nature and Circumstances of the Offense

Mr. Blythe is remorseful for his conduct and with treatment in the past several months has acknowledged some of his demons that led to this offense. He vows never to repeat it and wishes to continue with his treatment. He wrote a thoughtful letter to the Court where he discusses the last 9 months of reflection and how treatment has helped him acknowledge the severity of what he has done and has helped him get to the root of his disorder. *See* Exhibit 4, Letter from Mr. Blythe.

Dr. Fred Berlin has summarized Mr. Blythe's treatment and diagnosis to the Court and has explained that Mr. Blythe has been fully compliant with all

treatment recommendations. *See* Exhibit 5, Letter from Dr. Berlin (filed under seal). Notably, after spending time with Mr. Blythe over the course of four months, Dr. Berlin opines that he does not pose a risk to children and is motivated to make positive changes moving forward. *Id.*

Mr. Blythe's sister and third-party custodian has also described how her brother has changed while on pretrial release and while in her custody. *See* Exhibit 6, Letter from Karen Whiteside. Mrs. Whiteside explains to the Court that her brother has "demonstrated increased maturity, structure, and commitment to self-improvement." *Id.*

While the government is correct that some of the messages between Mr. Blythe and friends regarding young boys are troubling, it is important to emphasize that most of these messages did not involve criminal behavior. When breaking down the charged criminal conduct, Mr. Blythe is responsible for distributing 9 photographs of Child Sex Abuse Material (CSAM) and two videos of CSAM as well as possessing a large amount of CSAM materials on his phone. Notably, the last instance of Mr. Blythe distributing CSAM was in 2020, approximately 6 years ago. Mr. Blythe understands the seriousness of what he has done in enabling the cycle of abuse of children. He wants the Court to know that he has never, not once, touched a minor inappropriately or made any attempts to do so. Any discussion with friends about such was purely fiction. Mr. Blythe was aware he had a problem but always vowed never to cross that line.

Furthermore, the Court should not consider uncharged conduct in deciding what is an appropriate sentence for Mr. Blythe.[2] *See United States v. Bell*, 808 F.3d 926, 927 (D.C. Cir. 2015) (Kavanaugh, J., concurring) ("Allowing judges to rely on acquitted or uncharged conduct to impose higher sentences seems a dubious infringement of the rights to due process and to a jury trial").

In addition, Mr. Blythe's conduct was particularly unsophisticated when considering the kinds of cases courts often have seen where defendants employ complicated techniques to evade detection by law enforcement. In this case, Mr. Blythe sent text messages and saved items in his photo library. This shows that while on supervised release, the Court will be assured that monitoring Mr. Blythe will not be difficult.

Lastly, Mr. Blythe's conduct can be distinguished from those who traded and sold materials and those who participated in extensive websites that allowed for the administration of the purchase and download of these materials.

### c. The Need to Promote Respect for the Law, Provide Just Punishment, Protect the Community and Provide Adequate Deterrence, and the Need to Avoid Unwanted Sentencing Disparities

The recommended sentence will promote respect for the law and provide just deterrence. Firstly, Mr. Blythe will have to register as a sex-offender. Sex offender registration and sex offender supervision is far more invasive than the supervision

---

[2] The government references uncharged conduct regarding a former patient that is uncorroborated.

requirements in a typical criminal case. These stringent requirements alone act as sufficient deterrence from future similar behavior. Sex offender supervision requires intensive treatment that subjects defendants to polygraph examinations. Sex offender registration requires a prohibition of residing in certain areas and informs the public of one's offense.

In addition, Mr. Blythe will never again work in the mental health field and must start a whole new life upon his release. Knowing that he has lost the career he worked so hard to build is another collateral consequence of his offense that serves to deter him. Most notably, the trauma he experienced from being brutally attacked while incarcerated and surgery that followed would be enough to permanently deter anyone, let alone Mr. Blythe, someone who has never been in trouble before. These collateral consequences are severe and are more than sufficient to deter Mr. Blythe.

Furthermore, the recommended sentence would not create unwanted sentencing disparities. As discussed in more detail below, the guideline calculation gives excessive weight to factors based on assumptions that are unfounded in general and particularly about this case. Given the acknowledged issues with the 2G2.2 guidelines, Courts have granted significant downward variances in similar cases. Former Chief Judge Howell, who was also a U.S. Sentencing Commissioner, has repeatedly imposed substantially below guideline sentences involving travel and possession cases. *See United States v. Godoc*, 12-cr-29 (BAH) (a sentence of 81 months imposed despite a guideline range of 210-262 months); *United States v. DeGrange*, 13-cr-297 (BAH) (a sentence of 57 months imposed for conduct that

involved travel and possession); and *United States v. Cunningham*, 13-cr-288 (BAH) (a sentence of 51 months imposed).

Many other judges in this district, have also imposed sentences well below the calculated guideline range for similar and more aggravating conduct. *See United States v. Steve Sollera*, 14-cr-225 (TSC) (sentence of 60 months imposed despite guideline range of 135-168 months); *United States v. Douglas Payne*, 11-cr-317 (ABJ) (sentence of 60 months imposed for conduct involving travel and possession); *United States v. Gange*, 13-cr-038 (JEB) (defendant who distributed large quantities of photos sentenced to 46 months); *United States v. Dietterle*, 13-cr-080 (ABJ) (defendant who distributed pornography and discussed meeting to engage in sexual contact with minor sentenced to 40 months); and *United States v. Matthew Scanlon*, 14-cr-007 (RC) (sentenced to 51 months imposed despite guideline range of 87-108 months – defendant doing well on supervision).

This Court has also granted significant downward variances in similar past cases. In *United States v. Ernest Wagner*, 19-cr-386 (DLF), the Court imposed the mandatory minimum sentence of 60 months' incarceration in a distribution case where the defendant knowingly distributed 84 videos of child pornography on a website designed to pay for and share illicit materials with others. In granting this variance, the Court varied significantly from the guideline range of 210-262 months. Mr. Wagner was 72 years old and also had medical concerns.

In *United States v. Allen Morrison*, 1:19-cr-263 (DLF), the Court varied downwards from a guideline range of 97-121 months and imposed a sentence of 72

months for a distribution case. Mr. Morrison had an aggravating factor in his case that is not present here, and that is that even after his devices were seized by the FBI, he continued to distribute child pornography. Mr. Morrison was also a 33-year-old man with significant prior trauma and mental health considerations.

Lastly, courts have acknowledged that the more advanced in age a defendant is, the more unlikely it is that they will recidivate. *See United States v. Nellum*, 2005 WL 300073 (N.D. Ind. Feb. 3, 2005) (taking into account fact that defendant, who was 57 years old at the time of sentencing, would upon his release have a very low likelihood of recidivism; citing Report of the U.S. Sentencing Commission, Measuring Recidivism: the Criminal History Computation of the Federal Sentencing Guidelines, May 2004).

### III.    **A Downward Variance Should Also Be Considered For the Same Reasons Previously Considered in U.S.S.G. § 5H1.4.**

The Sentencing Commission has previously recognized that someone's physical condition could be relevant in determining whether a downward departure is warranted. §5H1.4 (formerly). The recently published 2025 sentencing guidelines eliminated §5H Specific Offender Characteristics but in doing so made clear that "the Commission envisioned and framed this 2025 amendment to be outcome neutral, intending that judges who would have relied upon facts identified as a basis for a downward departure would continue to have authority to rely upon such

facts to impose a sentence outside the applicable guideline range as a variance under 18 U.S.C. § 3553(a).[3]"

The takeaway from the Commission's findings that were based upon scientific research is that this Court should consider the fact that Mr. Blythe suffered an extraordinary physical impairment that will impact the rest of his life as a reason to grant a downward variance.

**IV.    The Sentencing Guideline Enhancements set forth in U.S.S.G. §2G2.2 Result in a Guideline Range that is Incompatible with the 3553(a) Factors.**

The defense submits that in the present case the Sentencing Guidelines should be rejected on policy grounds. A sentencing judge "may vary from Guideline ranges based solely on policy considerations, including disagreements with the Guidelines." *Kimbrough v. United States*, 552 U.S. at 101 (2007). Such a policy disagreement is appropriate because several of the enhancements that apply have been widely criticized on policy grounds. Many circuit courts have expressed concern over the high guideline range that child pornography cases produce. *See United States v. Grober*, 624 F.3d 592, 597 (3d. Cir. 2010) (discussing articles that show the flawed nature of the child pornography guidelines).[4] The Court also

---

[3] 2025 Sentencing Guidelines Manual, Chapter 1, Subpart A, also explaining in the Introductory Commentary that "the guidelines and policy statements set forth throughout the Guidelines Manual represent the first step in the sentencing process and are one of multiple factors judges must consider under 18 U.S.C. § 3553(a)." This language acknowledges that non-guideline sentences are a normal part of the sentencing process.

[4] *See* Stabenow, Troy, *Deconstructing the Myth of Careful Study: A Primer on the Flawed Progression of the Child Pornography Guidelines*, available at https://www.fd.org/sites/default/files/criminal_defense_topics/essential_topics/sentencing_resources/deconstructing_the_guidelines/child-porn-july-revision.pdf (last viewed on October 24, 2023) . In this article, the progression of the guidelines are dissected and show that the

reviewed many district court opinions and one circuit opinion that expressed concern over the child pornography guidelines and found that they were not based on empirical data. *See United States v. Dorvee*, 616 F.3d 174 (2d. Cir. 2010); *United States v. Baird*, 580 F.Supp.2d 889 (D. Neb. 2008); *United States v. Shipley*, 560 F.Supp.2d 739 (S.D. Iowa 2008). In fact, *Grober* explained why the district court found the guidelines to be so flawed and it is because it found that most of the enhancements are essentially inherent in the crime and applied in almost every case. *Grober*, 624 F.3d at 597.[5]

Applying these flaws to the instant matter, it is clear that a few of the enhancements applied to Mr. Blythe are inherent in the crime itself. Firstly, Mr. Blythe received the two-level enhancement for use of a computer or interactive device. It is hard to imagine in this day and age how someone would access child pornography but not for the internet. Second, he received a significant 5 level enhancement based solely on the number of images he possessed. The correlation between number of images and overall culpability is arbitrary and not based upon

---

base offense level for child pornography offenses evolved from a based offense of 13 to 17 in 1996 and then to 18 (for possession only) in order to account for various circumstances typically associated with modern day child pornography offenses. Unfortunately, the additional enhancements that were also added over the years contradict this intention to modify the base offense level to reflect the seriousness of the offense. Now, we are in a situation where the base offense level is supposed to account for the egregiousness of most offenses but is oddly doubled in severity for defendants because of the extra enhancements resulting in adjusted offenses levels of 26 and beyond for most cases.

[5] The second circuit also agreed with this analysis in *United States v. Tutty*, 612 F.3d 128 (2d Cir. 2010) and *United States v. Volpe*, 224 F.3d 72 (2d Cir. 2000). These cases explain in detail why certain enhancements would apply in virtually almost every case. For example, the computer enhancement allows "double-counting" because effectively increases a defendant's sentence to reflect the kind of harm that has already been accounted for the modern day offense levels.

14

scientific data. Mr. Blythe, as discussed above, was not sophisticated and kept images in his library. There is no telling how long those images were there and whether there were duplicates. Lastly, Mr. Blythe received an additional two-level enhancement for distribution, which is entirely duplicative of his offense conduct. Just eliminating those enhancements that are inherent in Mr. Blythe's crime would bring his guideline range down to 57-71 months.

Even still, removing those enhancements does not fix the flawed nature of 2G2.2. Even the Sentencing Commission has acknowledged that U.S.S.G. § 2G2.2 is not the product of "empirical data and national experience" but rather a reaction to Congress's push for mandatory minimum sentences. *United States Sentencing Commission, Fifteen Years of Guideline Sentencing*, at 73 (Nov. 2004) ("frequent mandatory minimum legislation and specific directives to the Commission to amend the Guidelines make it difficult to gauge the effectiveness of any particular policy change, or to disentangle the influences of the Commission from those of Congress"); *United States v. Hanson*, 561 F. Supp. 2d 1004 (E.D. Wisc. 2008); *United States v. Baird*, 580 F.Supp. 2d 889, 892 (D. Neb. 2008) ("when Guidelines are not the result of 'the Commission's exercise of its characteristic institutional role,' such as when they are not based on an empirical approach, but instead keyed to or guided by statutory directives, a court is not presented with an 'ordinary case,' in which 'the Commission's recommendation of a sentencing range will reflect a rough approximation of the sentences that might achieve 3553(a)'s objectives'"); *United States v. Johnson*, 588 F.Supp 2d 997, 1004 (S.D. Iowa) ("because [2G2.2.] does not

reflect the unique institutional strengths of the Sentencing Commission in that they are not based on study, empirical research, and data, the Court affords them less deference").

When further considering the fact that this is Mr. Blythe's first offense as his guideline range is driven by factors not based upon empirical data or research, it is clear that the guidelines overrepresent the seriousness of his criminal conduct.

## V.    The government and probation's recommendations are far too severe considering all of the 3553(a) factors.

To start, probation's recommendation seems to be entirely based upon uncharged conduct that the government provided in "proffer" format to probation.[6] For all of the reasons already stated, this is not an appropriate basis to increase Mr. Blythe's sentence, especially given the lack of evidence to support some of these claims. In addition, probation (and the government) seems to only use Mr. Blythe's background as a mental health professional as an aggravating factor. However, Mr. Blythe made a lot of positive contributions to the community as well through his profession, as described by the letters of support. In particular, Kim Cauthen, who is a therapist herself, describes how committed Mr. Blythe was to his job, "saving people's lives through therapy." Exhibit 1, Letter from Kim Cauthen. Mr. Blythe's history and characteristics should be weighed fairly, also accounting for the good he did in his life.

---

[6] The government emailed a long document drafted by government counsel that proffers the additional materials to probation that probation accepted in its entirety in the PSR.

The government's recommendation asks the Court to sentence Mr. Blythe at the top of the already flawed sentencing guideline range despite his acceptance of responsibility and all of the mitigating factors in this case. The government's recommendation asks the Court to impose a disparate sentence. It is also mostly based upon uncharged conduct and conversations between Mr. Blythe and individuals that did not even involve criminal conduct. Counsel for Mr. Blythe acknowledges that the Court can consider some relevant conduct in connection with sentencing, however what has been displayed by the government and by probation goes far beyond relevant conduct and crosses a line into irrelevant unproven allegations that serve to assassinate Mr. Blythe's character and deprive him of any due process.

For example, the government interviewed Witness-1, who is a former significant other of Mr. Blythe. That relationship ended badly, and Mr. Blythe was the one who ended the relationship due to his partner's infidelity and betrayal. The government now irresponsibly submits this interview to the Court knowing that this was a scorned relationship. Similarly, the government submits a former patient's report that Mr. Blythe cannot even contest due to confidentiality rules that prevent him from sharing patient's confidences. Surprisingly, the government even speculates as to what Mr. Blythe intended by jail calls that were completely taken out of context. The government has also taken conversations with C.D. out of context speculating as to Mr. Blythe's intentions.

The government's submission is a blatant attempt to persuade the Court to punish Mr. Blythe for uncharged conduct in violation of his due process rights. They have given no consideration to any other 3553(a) factor besides the nature and circumstances of the offense.  Their recommendation should be rejected based upon these reasons.

## CONCLUSION

For the reasons stated above, Mr. Blythe respectfully requests that the Court impose a sentence of 60 months' incarceration, the mandatory minimum sentence in this case and to recommend that Mr. Blythe serve his period of incarceration at FCI Elkton. Mr. Blythe also requests that the Court order that he participate in the "RDAP" program.

Dated:                                         May 19, 2026

                                               Respectfully submitted,

                                               A.J. KRAMER
                                               FEDERAL PUBLIC DEFENDER

                                        By:    s/Maria N. Jacob
                                               Assistant Federal Public Defender
                                               Office of the Federal Public Defender
                                               625 Indiana Avenue, N.W., Suite 550
                                               Washington, D.C. 20004